[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 18 2001
THOMAS K. KAHN
CLERK

_____

No. 00-16472

_____

D.C. Docket No. 00-03207-CV-WBH-1

DELTA AIR LINES, INC.,

Plaintiff-Appellant,

versus

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Northern District of Georgia

_____

**(January 18, 2001)**

Before TJOFLAT, BARKETT and MAGILL*, Circuit Judges.

_____
*Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

This case is before the court on Delta Air Lines' appeal of the district court's denial of a preliminary injunction against the Air Line Pilots Association. Because we find concerted action on the part of the pilots and because the Air Line Pilots Association has a duty under the Railway Labor Act, 45 U.S.C. § 152 First, to prevent such action, we reverse and remand to the district court with instructions to issue an appropriate injunction.

I.

A.

Delta Air Lines, Inc. ("Delta") and the Air Line Pilots Association, International ("ALPA") are parties to a collective bargaining agreement ("CBA") that governs the terms and conditions of employment for over 9,800 pilots employed by Delta.[1] Delta and ALPA commenced negotiations for a new CBA in September 1999. These negotiations are ongoing.

In the midst of these ongoing negotiations, Delta pilots began to decline to fly "overtime." Overtime is built into Delta's flight schedule, accounting for

---

[1] Delta is a common carrier by air engaged in the transportation of passengers and freight in intrastate and interstate commerce throughout the United States. ALPA is a labor organization that is the exclusive bargaining representative of Delta's pilots.

approximately five to seven percent of scheduled flights, and derives from the

CBA.[2]  "Overtime" is in some ways a misnomer, for this is really unscheduled

"open time" on the flight schedule in which pilots may volunteer to fly additional

flights above their pre-arranged flight schedule.  Although Delta maintains a pool

of reserve pilots to operate flights in the event a scheduled pilot is unavailable, it

relies upon pilots to "pick up" these overtime flights in order for Delta to operate

all of its scheduled flights.[3]  A pilot has the right, under the CBA, to exercise his or

[2] Under the current CBA, Delta schedules flights for public purchase, hires and trains pilots to operate those flights, places the flights in monthly pilot schedules that pilots bid to operate, maintains a number of "reserve pilots" to operate flights in the event that scheduled pilots become unavailable, and offers "open time" flights to pilots for flying as "overtime" above their schedule.

[3] There are three kinds of "overtime" flights: White Slip, Green Slip, and Green Slip with Conflict.  White Slip flying, the most common kind of overtime (an average of 6.77% of the total pilot credit hours per month from October 1, 1999 to September 30, 2000 were accounted for by white slip flying), is done at regular contract rates.  Green Slip and Green Slip with Conflict are flown at premium rates, but do not reduce the availability of a particular pilot for overtime in subsequent months.

Pilots generally fly a monthly work schedule for which they have bid, according to their training on particular equipment and seniority.  A number of pilots, usually between fifteen and twenty-five percent, are scheduled as reserves.  Open time may be assigned to reserves, if they are available.  Generally, though, open time flights are filled by pilots who voluntarily pick up open time; this increases a pilot's flight hours and income.  Pilots who desire premium pay may choose to fly Green Slip rather than White Slip, which means that the pilot will only be called upon after all pilots with White Slips and reserves for that day have been used to fill vacancies.  A pilot may also request to fly open time hours on a flight which conflicts with the pilot's pre-assigned schedule; this is Green Slip with Conflict.  If this open time is awarded, then the pilot drops his or her originally scheduled trip but receives payment for both the pre-assigned trip and the trip actually flown.

Another method of flight staffing is "inverse assignment."  Inverse assignment involves Delta contacting available and qualified pilots, in inverse order of seniority, to operate a flight.  Inverse assignment duties pay premium (double) rates, and inverse assignment occurs only after Delta has exhausted all pilots volunteering for White Slips and Green Slips.  Pilots often use

3

her individual choice and decline to pick up overtime flights. Additionally, a pilot can avoid being assigned to operate overtime flights by exercising his or her CBA rights not to answer a telephone call and not to return a telephone call to Delta; pilots may not be assigned to overtime flying unless they have spoken with Crew Scheduling.

Although each individual pilot may make personal choices about how and whether to work overtime, Delta relies upon many of the pilots choosing to work this open time to fulfill its scheduled flights. If all of Delta's pilots were to refuse to pick up additional flights and refuse to work overtime, Delta would not be able to operate its full complement of flights. Although there are some alternatives available to Delta under the CBA, including raising the "cap" on pilot hours in a given month, staffing flights with reserves or management pilots, and pre-canceling flights and rebooking passengers in advance, these alternatives are limited and generally do not allow Delta to fly its full complement of scheduled routes.

---

answering machines or fail to answer their telephones, which limits the value of inverse assignment since a pilot may not be assigned unless he or she returns a call to Crew Scheduling. Inverse assignment with conflict works in the same way as regular inverse assignment, except that Delta calls upon pilots whose pre-assigned schedule will conflict with the proposed inverse assignment. Therefore, inverse assignment with conflict only occurs after Green Slips with Conflict, as well as all other methods of filling pilot vacancies, are exhausted.

Beginning in November 2000, apparently just in time for holiday travel, Delta pilots intensified their "no-overtime campaign."[4] This action by the pilots, viewed in the context of the holiday travel season and the ongoing labor negotiations between ALPA and Delta, leads to the obvious inference that the pilots are seeking to pressure Delta into making concessions in the negotiations for a new CBA.

The effects of the pilots' no-overtime campaign are evident from Delta's flight statistics. Historically, Delta cancels no more than one or two of 2,700 flights daily due to lack of pilots. However, in November 1999, pilots averaged 2,053 daily requests for overtime; in November 2000 they averaged only 1,276 daily requests. In the first three days of December 1999, pilots averaged 1,678 daily requests; in those same days in December 2000 they averaged 503 requests. Delta canceled a total of ten flights due to pilot shortages for the month of November 1999, while it canceled 375 flights in November 2000. In the first three days of December 1999, Delta had no cancellations; in the first three days of

---

[4] There is evidence in the record indicating that the pilots' actions had been ongoing since late summer, but the no-overtime campaign increased in intensity and resolve beginning in November.

December 2000 Delta canceled 386 flights.[5] Clearly, the pilots' efforts to refuse overtime is affecting both Delta's flight schedule and the traveling public.[6]

In the midst of the no-overtime campaign by the pilots, Delta tried to work with ALPA by enlisting ALPA's assistance in ending the pilots' concerted no-overtime campaign. During this time, ALPA issued a number of directives to the pilots advising them of their rights under the CBA regarding overtime; ALPA recommended flying overtime at premium rates – green slip flying. By November 2000, when some pilots were advising (and sometimes threatening) other pilots not to seek or fly overtime, the Delta Master Executive Council of ALPA ("MEC")[7] advised pilots several times, through several media, that pilots should respect the choices of others regarding overtime and that whether to fly overtime was the individual choice of each pilot. These steps by ALPA and the MEC had no measurable effect on the pilots' no-overtime campaign. Delta was unable to overcome the no-overtime campaign either through compensatory scheduling

---

[5] Delta has submitted additional information indicating that over 1,200 flights were canceled between November 19, 2000 and December 10, 2000, and an additional 4,037 scheduled flights were canceled between December 11, 2000 and January 1, 2001 – all due to a lack of pilots.

[6] Delta's November 2000 cancellations affected 340,000 passengers who were booked on the canceled flights. The cancellations during the first three days of December 2000 affected an additional 30,000 passengers. Delta reports that an additional 375,000 passengers were affected by the cancellation of 4,037 scheduled flights from December 11, 2000 to January 1, 2001.

[7] The MEC is the governing body for Delta's ALPA-represented pilots.

methods or through ALPA's communications; therefore, Delta filed the present action.

B.

Delta filed a verified complaint on December 5, 2000 in the district court for the Northern District of Georgia. The complaint alleged an unlawful job action in violation of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188.[8] The complaint named fifty-one defendants, including ALPA, the MEC and its officers, and several individual pilots.[9] Delta filed motions for a temporary restraining order ("TRO") and a preliminary injunction on December 5. The district court held a hearing on Delta's motions for a TRO and preliminary injunction on December 6. The district court denied both motions on December 11. Delta filed its Notice of Emergency Appeal the following day, December 12. Delta also moved for an injunction pending appeal; we denied that motion on December 13. However, in that same order, we granted Delta's motion for an expedited appeal. Moving on the expedited basis, oral argument was heard on January 11, 2001.

---

[8] Delta is a common carrier by air under the terms of the RLA, 45 U.S.C. § 181. ALPA is the legal representative for Delta's pilots under the terms of the RLA, 45 U.S.C. § 152 Third.

[9] Delta also named one hundred "John Does" and one hundred "Jane Does" in its complaint.

7

II.

A.

The Railway Labor Act was passed in its initial form by Congress in 1926, with the support of both the railroads and the unions.  Although a number of amendments have been introduced over the years, including extending the RLA to the airline industry in 1936, the stated purposes have remained constant.  The first of the RLA's five listed purposes is "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein."  45 U.S.C. § 151a.[10]  To accomplish its purposes, especially this first purpose, the RLA imposes a substantive duty upon "all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements . . . and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152 First.  Because the statutory structure reveals that this duty is at the "heart" of the

_____

[10] Section 151a, in full, reads:
The purposes of [the RLA] are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of [the RLA]; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

8

RLA, see Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 377-78, 89 S. Ct. 1109, 1115, 22 L. Ed. 2d 344 (1969), and because of the legislative history of the provision,[11] the Supreme Court has clarified that section 152 First imposes a legal duty enforceable by courts: "[W]e think it plain that [section 152 First] was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis."  Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577, 91 S. Ct. 1731, 1735, 29 L. Ed. 2d 187 (1971).

The RLA sets forth a detailed sequence of steps that carriers and their employees (or their employees' representative) must undertake in negotiating

---

[11] In the House hearings on enacting this section of the RLA, Donald R. Richberg, counsel for the organized railway employees supporting the bill, stated plainly that section 152 First imposed a binding legal obligation on the parties.  He stated, "it is [the parties'] legal duty to exert every reasonable effort . . . to settle all disputes, whether arising out of the abrogation of agreements or otherwise, in order to avoid any interruption to commerce.  In other words, the legal obligation is imposed, and as I have previously stated, and I want to emphasize it, I believe that the deliberate violation of that legal obligation could be prevented by court compulsion."  In further explaining why the provision applied equally in general terms to both parties in RLA cases, he explained:
> We believe, and this law has been written upon the theory, that in the development of the obligations in industrial relations and the law in regard thereto, there is more danger in attempting to write specific provisions and penalties into the law than there is in writing the general duties and obligations into the law and letting the enforcement of those duties and obligations develop through the courts in the way in which the common law has developed in England and America.

Hearings on Railroad Labor Disputes (H.R. 7180) before the House Committee on Interstate and Foreign Commerce, 69th Cong., 1st Sess., 91 (1926) (quoted in Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577, 91 S. Ct. 1731, 1735, 29 L. Ed. 2d 187 (1971)).

collective bargaining agreements. The RLA intentionally provides for slow movements by all parties during this negotiation and bargaining process. As the Supreme Court has recognized, the RLA "subjects all railway disputes to virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation.'" Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees, 481 U.S. 429, 444, 107 S. Ct. 1841, 1850, 95 L. Ed. 2d 381 (1987) (quoting Detroit & Toledo Shore Line R.R. Co. v. Transp. Union, 396 U.S. 142, 148-49, 90 S. Ct. 294, 298, 24 L. Ed. 2d 325 (1969)). The bargaining procedures of the RLA are "purposely long and drawn out" in the hope that reason will, in time, produce an agreement. Bhd. of Ry. and S.S. Clerks v. Fla. E. Coast Ry. Co., 384 U.S. 238, 246, 86 S. Ct. 1420, 1424, 16 L. Ed. 2d 501 (1966).

During the long negotiating process, the RLA seeks to protect the public, carriers, and unions alike by imposing a legal duty upon carriers and unions to maintain the status quo with respect to "rates of pay, rules, [and] working conditions," even when there is a disagreement about the CBA. 45 U.S.C. §§ 155-56; Consol. Rail Corp. ("Conrail") v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302-03, 109 S. Ct. 2477, 2480, 105 L. Ed. 2d 250 (1989).[12] A failure by either side

---

[12] These status quo provisions of the RLA have been described by the Court as "central to its design." Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 150, 90 S. Ct. 294, 299, 24 L. Ed. 2d 325 (1969).

to maintain the status quo during the bargaining and mediation process may give rise to injunctive relief, even without the customary showing of irreparable injury. Id.; see also Detroit & Toledo Shore Line R.R. Co., 396 U.S. 142, 90 S. Ct. 294 (upholding a status quo injunction).

## B.

In cases where a carrier seeks injunctive relief against a union, a court must look not only to the RLA, but also to the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. §§ 101-115, to determine whether the court has jurisdiction. As a general rule, the NLGA prohibits courts from issuing injunctive relief in labor disputes.[13] 29 U.S.C. §§ 101, 104; Int'l Ass'n of Machinists v. Street, 367 U.S. 740, 772, 81 S. Ct. 1784, 1802, 6 L. Ed. 2d 1141 (1961) ("The [NLGA] expresses a basic policy against the injunction of activities of labor unions."). The NLGA also generally prohibits a court from holding a union responsible for illegal acts of the union members. 29 U.S.C. § 107(a) ("[N]o injunction or temporary restraining order

---

[13] A "labor dispute" under the NLGA "includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relationship of employer and employee." 29 U.S.C. § 113(c). The Supreme Court has explicitly held that the NLGA covers the railroads, see Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees, 481 U.S. 429, 440, 107 S. Ct. 1841, 1848, 95 L. Ed. 2d 381 (1987), and therefore, by extension, the airlines.

shall be issued on account of any threat or unlawful act excepting against the . . . organization making the threat or committing the unlawful act or actually ratifying the same after actual knowledge thereof."); 29 U.S.C. § 106 ("No . . . organization shall be held responsible or liable . . . for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."). The NLGA also prescribes procedural rules for civil proceedings in which an employer seeks an injunction or TRO against its employees. For an injunction, live testimony with opportunity for cross-examination is normally required after proper notice; for a TRO, though, sworn affidavits may suffice if the complainant would suffer "substantial and irreparable injury" without the TRO. 29 U.S.C. § 107.

C.

The Supreme Court has stated that although the prescriptions and proscriptions of the NLGA are clear, the NLGA "cannot be read alone in matters dealing with railway disputes." Bhd. of R.R. Trainmen v. Chicago River & Ind. R.R. Co., 353 U.S. 30, 40, 77 S. Ct. 635, 640, 1 L. Ed. 2d 622 (1957). Rather, "[t]here must be an accommodation of [the NLGA] and the [RLA] so that the

obvious purpose in the enactment of each is preserved." Id.[14]  The way to accommodate these two statutes, in most circumstances, is to determine if specific provisions of the RLA are implicated.  If so, "the specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]."  Id. at 42, 77 S. Ct. at 641; accord Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n, 491 U.S. 490, 513, 109 S. Ct. 2584, 2598, 105 L. Ed. 2d 415 (1989).

When a specific provision of the RLA is implicated, "the District Court has jurisdiction and power to issue necessary injunctive orders [to enforce compliance with the requirements of the RLA] notwithstanding the provisions of the [NLGA]." Bhd. of R.R. Trainmen v. Howard, 343 U.S. 768, 774, 72 S. Ct. 1022, 1025, 96 L. Ed. 1283 (1952); see also Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 91 S. Ct. 1731, 29 L. Ed. 2d 187 (1971) (holding that 45 U.S.C. § 152 First creates a legal obligation which a court may enforce through injunction, notwithstanding section 4 of the NLGA (29 U.S.C. § 104)); Chicago River, 353 U.S. at 42, 77 S. Ct. at 641 (holding that injunctive relief is appropriate under the

---

[14] According to the Supreme Court, the two Acts have different purposes.  On the one hand, "[i]n adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry." Chicago River, 353 U.S. at 40, 77 S. Ct. at 640.  It did this because disputes between labor and management "had resulted in the aggregate being serious enough to threaten disruption of transportation." Id.  On the other hand, "[t]he Norris-LaGuardia Act . . . was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining." Id.

13

RLA when a specific provision is implicated, notwithstanding the general provisions of the NLGA); <u>Virginia Ry. Co. v. Sys. Fed'n No. 40</u>, 300 U.S. 515, 549-52, 57 S. Ct. 592, 600-02, 81 L. Ed. 789 (1930) (holding that injunctive relief is proper under the RLA).[15] Although the NLGA usually deprives federal courts of jurisdiction in general categories of labor disputes,[16] federal courts retain

---

[15] Appellee cites two circuit court cases purportedly on point regarding the relationship or the RLA and the NLGA. See <u>Fry v. Airline Pilots Ass'n, Int'l</u>, 88 F.3d 831, 841-42 (10th Cir. 1996) (holding that the union could not be held liable for damages in state tort law claim for the alleged harassment of pilots who had worked through a strike without a showing of actual union authorization or ratification); <u>Airline Pilots Ass'n Int'l v. United Air Lines</u>, 802 F. 2d 886, 905-06 (7th Cir. 1986) (stating in dicta that the airline's evidence of a "sickout," using only statistical evidence and without identifying even one pilot who had taken sick leave without actually being sick, was insufficient to show a <u>status quo</u> violation at all, and therefore "would generally end the discussion"). We find these cases to be inapposite.

[16] 29 U.S.C. § 104 provides:
No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
(a) Ceasing or refusing to perform any work or to remain in any relation of employment;
(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;
(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;
(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
(g) Advising or notifying any person of an intention to do any of the acts heretofore

14

jurisdiction "to enjoin compliance with various mandates of the [RLA]." Int'l

Ass'n of Machinists v. Street, 367 U.S. 740, 772, 81 S. Ct. 1784, 1802, 6 L. Ed. 2d

1141 (1961). However, this exception for the RLA is limited, and an injunction

usually may lie only if, in addition to violation of a specific principle of the RLA,

an injunction is the sole practical, effective means of enforcing the Act. See

Burlington N. R.R. Co. v. Bhd. of Maintenance of Way Employees, 481 U.S. 429,

446, 107 S. Ct. 1841, 1851, 95 L. Ed. 2d 381 (1987).

It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a

"specific provision" of the RLA and, moreover, is central to the purpose and

functioning of the RLA. Therefore, the provision takes precedence over the more

general provisions of the NLGA. This is not to say that the procedural standards of

the NLGA do not apply, but only that the substance of the RLA is controlling. We

therefore hold that when this specific provision of the RLA is implicated and there

is no other effective way to enforce the RLA, the NLGA does not prohibit a federal

court from issuing an appropriate injunction.

---

specified;
(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

15

III.

A.

Contrary to ALPA's assertion, we hold that the district court had jurisdiction to hear the initial complaint: It did not arise from a "minor dispute," which would have rendered it subject to mandatory and exclusive arbitration under the RLA.[17] We reject ALPA's contention that the CBA "arguably" allows all pilots to refuse to work overtime, when it is clear industry practice to structure flight schedules with "open time" built in. The only reasonable explanation for this customary practice is an expectation that not all of the pilots will choose to refrain from working overtime at the same time; this is implicit in the CBA. Further, this dispute centers

---

[17] "Minor disputes" are disputes over grievances or the interpretation or application of agreements under the RLA. Consol. Rail Corp. ("Conrail") v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 302-07, 109 S. Ct. 2477, 2480-83, 105 L. Ed. 2d 250 (1989). Exclusive jurisdiction over minor disputes rests with the system adjustment board. See id. at 303-04 and 304 n.5, 109 S. Ct. at 2481 and 2481 n.5; Pyles v. United Air Lines, Inc., 79 F.3d 1046, 1049-50 (11th Cir. 1996). A decision of the appropriate system adjustment board with respect to an issue of interpretation or application of a collective bargaining agreement is final and binding on the parties in almost all circumstances. See Conrail, 491 U.S. at 303-04, 109 S. Ct at 2481.

"Major disputes," by comparison, concern the formation or modification of collective bargaining agreements. See Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 723-24, 65 S. Ct. 1282, 1289-90, 89 L. Ed. 1886 (1945). Conduct that affects the status quo of a pre-existing agreement is a major dispute for purposes of the RLA, and is properly brought before a federal court rather than a system adjustment board. See Conrail, 491 U.S. at 302-03, 109 S. Ct. at 2480.

If the conduct giving rise to an alleged status quo violation is arguably permitted by the CBA, the resulting dispute is a minor dispute, because it involves interpretation of the CBA. See id. at 307, 109 S. Ct. at 2483 ("Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' [CBA]. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.").

on 45 U.S.C. § 152 First, which imposes a statutory obligation "to exert every reasonable effort to make and maintain agreements." This clear statutory provision is at the heart of the RLA and is clearly within the province of the federal courts to enforce. When the public interest, commerce, and a clear statutory provision are implicated, we will not shy away from holding the parties to their duties under the RLA so as to avoid "any interruption to commerce." 45 U.S.C. § 152 First.

## B.

This is an appeal from the denial of a preliminary injunction. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1292, which permits appeals from interlocutory orders of district courts "granting, continuing, modifying, refusing or dissolving injunctions." We generally review a denial of preliminary injunctive relief on an abuse of discretion standard. Siegel v. LePore, ___ F.3d ___, No. 00-15981 (11th Cir. Dec. 6, 2000).[18] We note that in RLA cases

_____

[18]A district court may grant preliminary injunctive relief only if the moving party shows four things:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Siegel v. Lepore, ___ F.3d ___, No. 00-15981 (11th Cir. Dec. 6, 2000). The district court, had it properly applied the law, would have found that Delta met all four of these factors. The substantial likelihood of success on the merits is discussed infra Part III.C. Irreparable injury surely would be suffered by Delta by canceling a number of flights, losing customer goodwill, and losing revenues (although a showing of irreparable injury is not actually required under

17

a carrier need not show irreparable injury, a usual prerequisite for obtaining an injunction, to enjoin a violation of the <u>status quo</u> because of the strong public interest in enforcing the RLA. <u>See</u> <u>Conrail</u>, 491 U.S. at 303, 109 S. Ct. at 2480. However, even if we were to look at the traditional factors for a preliminary injunction, we would still review <u>de novo</u> the district court's application of the law. <u>Haitian Refugee Ctr. v. Baker</u>, 949 F.2d 1109, 1110 (11th Cir. 1991) (per curiam) ("[I]f the trial court misapplies the law we will review and correct the error without deference to that court's determination."); <u>see also</u> <u>Cuban American Bar Ass'n v. Christopher</u>, 43 F.3d 1412, 1423-24 (11th Cir. 1995) ("[T]he district court misapplied the law governing the issues presented in this case. Thus, we accord no deference to the district court's determinations in granting the preliminary injunctions in this case."). Because we find that the district court misapplied the law in the instant case by failing to recognize the extent of ALPA's duty under 45 U.S.C. § 152 First, we accord no deference to the district court's misapplication of the law.

C.

---

<u>Conrail</u>, 491 U.S. at 303, 109 S. Ct. at 2480). There is no threatened injury to the non-movant by the issuance of an injunction. Finally, the injunction furthers the public interest by insuring the continued operation of air travel on a major carrier.

The district court erred in failing to appreciate the depth and seriousness of the duty to "make and maintain agreements" in a way so as "to avoid any interruption to commerce or to the operation of any carrier." 45 U.S.C. § 152 First. In the instant case, our focus is on ALPA's duty to maintain agreements to avoid interruption of commerce.[19] As the Supreme Court has stated, this language of the RLA creates a substantive legal duty "enforceable by whatever appropriate means might be developed on a case-by-case basis." Chicago & N.W. Ry. Co., 402 U.S. at 577, 91 S. Ct. at 1735. An injunction is an appropriate remedy to compel the performance of this legal duty. See Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, 416 F.2d 998 (5th Cir. 1969) (approving of an injunction against the union to issue directives to its members to restore the status quo when union members were engaging in unlawful "wildcat" strikes).[20]

The district court made explicit findings that there was an "ongoing concerted effort on the part of some Delta pilots to refuse overtime work." In its

_____

[19] This section of the RLA imposes the same duty upon employees. 45 U.S.C. § 152 First. The obvious implication from this is that Delta pilots may not collectively disrupt Delta's flight operations, in contravention of the CBA, by instituting a disruption in Delta's operations by way of a no-overtime campaign. The district court found that such an unlawful no-overtime campaign was occurring and properly applied this provision of the RLA against the pilots. The district court did not enjoin individual pilots, though, and thereby did not seek judicially to enforce this clear provision of the RLA.

[20] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"Findings," the district court analyzed the number of canceled flights and pilots' reduced requests for overtime and found that "the statistics differ so substantially that the difference can only be explained by the efforts of an undisclosed number of pilots to undermine contract negotiations, seeking leverage for a salary increase." The court did not rest solely on statistical evidence, though, but looked to other evidence, including e-mails, "many of which rise to the level of intimidation and harassment." The court found that the "traveling public" and Delta are both harmed by the pilots' concerted activity:

> This reduction in requests for overtime is causing harm to Delta and the traveling public. Delta has lost millions of dollars in revenues, rerouting expenses, extra operating costs, and overnight hotel and meal vouchers. Additionally, Delta has suffered loss in the form of good will and traffic that is immeasurable. The public has suffered loss in time and money from the delays and cancellations which is also immeasurable.

In spite of these findings, the court refused to issue an injunction against ALPA and/or MEC. It based this refusal on the fact that "[n]either the Union leadership [of ALPA] nor the [MEC] supports this effort [by the pilots] and both have, in fact, counseled against it." While it is true that ALPA and the MEC "counseled against" the efforts of the pilots, it is equally clear that these union communiques were not effective in suppressing the pilots no-overtime campaign.

The district court's error came in its decision that it would "not hold that a union has an affirmative duty to end or prevent the unilateral unlawful activity of

20

its members." The RLA imposes such a duty on the union in section 152 First, and the district court should have enforced that duty. It is possible, of course, that ALPA has in fact done all that it can do in directing the pilots to cease their no-overtime campaign. We seriously doubt this is the case, however. What seems to be true is that while ALPA has admonished its members at Delta's request, it has not made "every reasonable effort" as required by statute. 45 U.S.C. § 152 First. ALPA is statutorily bound to do everything possible to "maintain" the CBA so that commerce is not in any way interrupted. We are not satisfied that ALPA has fulfilled this duty.[21] Therefore, the district court, on remand, should enjoin ALPA to take specific steps aimed at stopping the pilots' no-overtime campaign and resuming normal operations of Delta's operations, including its overtime scheduling.[22]

---

[21] See Pan American World Airways, Inc. v. Indep. Union of Flight Attendants, 93 Lab. Cas. ¶ 13,307 (S.D.N.Y. 1981) (holding that an injunction should issue against the union where the evidence showed that the union was encouraging "or at least failing to discourage" a sickout in violation of the union's duty under the RLA, 45 U.S.C. § 152 First); Trans World Airlines, Inc. v. Int'l Ass'n of Machinists and Aerospace Workers, 87 L.R.R.M. (BNA) 2556, 75 Lab. Cas. ¶ 10,312 (W.D. Mo. 1974) (holding that the union had failed to meet its duty under the RLA, 45 U.S.C. § 152 First, where the union did not authorize unlawful activity by employees but did not take affirmative "reasonable" efforts to end such activities by the union members).

[22] Because we agree with the district court that the individual pilots are making a concerted, collective effort to reject overtime and institute an unlawful disruption of Delta's operations, we need not rule on whether ALPA has ratified the pilots' actions and is therefore directly responsible for the no-overtime campaign. The duty of ALPA under the RLA is sufficiently high that even if it has not sponsored or ratified the unlawful job action by the pilots, it has a duty to end such unlawful action.

It is possible, although unlikely, that ALPA has lost control of its members and that the pilots are truly acting contrary to ALPA's wishes and directives. If this proves to be the case (which would become evident if the district court's injunction against ALPA is ineffective at stopping the no-overtime campaign), then National Airlines, Inc. v. International Ass'n of Machinists & Aerospace Workers, 416 F.2d 998 (5th Cir. 1969), would apply. In National Airlines, the union had lost control of its members (and conceded as much to the court) and the members were conducting "wildcat strikes"; the union was admittedly powerless to prevent this. In this circumstance, the airline came to the court seeking permission to terminate some of the employees if they failed to work under the terms of their CBA. (The airline approached the court because the RLA would not have permitted the airline's self-help without judicial intervention.) In National Airlines, the former Fifth Circuit allowed the airline, faced with employees who were violating the CBA and a union that had lost control of its members, to take direct action against the employees.

If ALPA cannot control the pilots, some of whom are admittedly violating the CBA by advocating concerted action, then Delta may return to the district court for additional relief. The district court would, at that point, join all appropriate parties as defendants (presumably sua sponte) and enjoin them from engaging in

22

continued activity in violation of the CBA, under penalty of court sanction or other adverse employment action.

## D.

Because the general procedural provisions of the NLGA still apply to this action, even though the anti-injunction portion of the NLGA does not, we must address the hearing before the district court. ALPA complains that Delta did not put on live testimony, with opportunity for cross-examination, as required by the NLGA, 29 U.S.C. § 107. While it is clear that section 107 requires live testimony in order to obtain a temporary or permanent injunction in a labor dispute, section 107 also provides alternate hearing requirements for a complainant to obtain a TRO. A TRO may be obtained to remedy "substantial and irreparable injury" on the basis of testimony under oath sufficient to justify the court's issuance of the TRO. 29 U.S.C. § 107. Reading the TRO and injunction provisions together, the purpose of section 107 is not so much about requiring <u>live</u> testimony, then, as it is about ensuring the presence of reliable evidence before a court may enjoin parties to a labor dispute.

23

In the instant case, although Delta did not put on live testimony, both sides presented sworn affidavits and a host of other evidence and testimony.[23] This evidence was largely undisputed – particularly as it related to the fact that the pilots were undertaking concerted action. ALPA's counsel conceded at the hearing that injunctive relief would be proper if Delta's pilots were engaged in concerted activity that violated the status quo; the district court did not hesitate to make explicit its finding of such concerted activity by the pilots in its dispositive order, and even in its closing comments at the hearing itself. Delta's evidence consisted of (1) written documents reflecting the pilots' overtime boycott (mainly in the form of captured e-mail communications); (2) union pronouncements and directives, which were concededly authentic; (3) statements of union members acknowledging the existence of the overtime boycott, which were concededly genuine; and (4) statistical evidence of the impact of the ban, which was not challenged by ALPA. ALPA presented its own documentary evidence, as well as relying upon some of the evidence presented by Delta. The only material issue at the hearing was whether ALPA actively sponsored or ratified the pilots' no-overtime campaign.

---

[23] Delta offered to put on its declarants as live witnesses, but the district court decided to proceed without live testimony.

24

Given that there was no dispute about the reliability of the evidence, at least as to the concerted action by the pilots, we believe the district court was entitled to rely upon such evidence to make its determinations.[24] See Ry. Express Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, 437 F.2d 388, 395 (5th Cir. 1971) (holding that section 107 was not violated when the district court used only briefs and affidavits to decide whether to issue an injunction; live testimony with cross-examination was not required). The purpose of section 107 is served if the evidence is inherently reliable and there is no harm to the parties. An analogy to the hearsay rule demonstrates the propriety of this holding. Hearsay statements are generally excludable because they suffer from a lack of reliability; reliability is generally established through live testimony and cross-examination. However, there are exceptions to the hearsay rule that do not contravene the Confrontation Clause, even though they permit the introduction of out-of-court statements, because the statements are inherently reliable.

IV.

---

[24] We do not pass judgment at this time as to whether there was reliable and undisputed evidence about ALPA's involvement in the no-overtime campaign. There appears to be a genuine dispute over ALPA's involvement sufficient to necessitate live testimony as contemplated by the NLGA, 29 U.S.C. § 107.

25

The district court properly determined that Delta's pilots were engaged in an unlawful no-overtime campaign. However, the district court improperly interpreted the gravity and depth of ALPA's duty under the RLA to prevent such an unlawful job action. Because there has been no showing that ALPA lacks control over the pilots, reason dictates that ALPA has not done enough to fulfill its statutorily mandated duty to "maintain" the agreement and avoid an "interruption to commerce." Upon remand, the district court shall issue appropriate injunctive relief directing ALPA to take further steps to end the pilots' no-overtime campaign. Further steps may include issuing directives as drafted by the court and threatening (or imposing) union sanctions for violations, as permitted by ALPA's constitution.[25] If ALPA complies with the court's orders and the no-overtime campaign continues, Delta may return to the district court for injunctive relief against individual pilots, as discussed supra Part III.C.

REVERSED and REMANDED, with instructions.

---

[25] ALPA's constitution permits the union to discipline, fire, or expel any member for a number of reasons, including "[a]cting in any manner to circumvent, defeat or interfere with collective bargaining between the Association and an employer or with existing collective bargaining agreements." ALPA Constitution and Bylaws, Art. VIII, Sec. 1.A.

BARKETT, Circuit Judge, concurring specially, in which MAGILL, Circuit Judge, joins:

I concur in the determination that under the law ALPA has an affirmative duty to exert every reasonable effort to prevent or stop the unilateral unlawful activity of its members and that it has not fulfilled that duty. Accordingly, I agree that this case should be remanded for the entry of an appropriate injunction requiring ALPA to take all reasonable steps to do so. However, any discussion of possible actions based on the possibility that ALPA cannot control its membership is premature.