[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11887
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-00544-RWS


CHRISTOPHER P. JAMISON,
JOHN CARTWRIGHT,
DAVID EDWARD MARCU,
TOMMIE D. BENEFIELD, JR.,
ANDREW ABT, et al.,

Plaintiffs - Appellants,

versus

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL,
LEE MOAK,
as President of Air Line Pilots Association, International,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 3, 2015)

Before MARCUS, WILLIAM PRYOR and JILL PRYOR, Circuit Judges.

PER CURIAM:

In September 2010, Southwest Airlines ("Southwest") announced an agreement to purchase the assets and equity of AirTran Airlines ("AirTran"). As part of the negotiation of the merger's terms, labor union Air Line Pilots Association, International ("ALPA") represented AirTran's pilot employees, while Southwest Airlines Pilots Association ("SWAPA") represented Southwest's pilots. After the Southwest and AirTran pilots voted in November 2011 to approve a pilot integration plan that ALPA and SWAPA jointly developed, a number of AirTran pilots (the "Pilots") sued ALPA, alleging that the union violated its duty of fair representation during the integration plan negotiations.[1] The district court granted summary judgment in ALPA's favor. After careful review, we affirm.

I.

Prior to the merger, ALPA had a collective bargaining agreement with AirTran that set forth all the terms and conditions of employment for all AirTran

---

[1] The original complaint was filed on February 21, 2012 by four AirTran pilots. These plaintiffs amended their complaint on August 31, 2012, to add 116 additional pilots as plaintiffs. ALPA argues on appeal that these additional plaintiffs' claims are barred by the statute of limitations. Because we decide this case on the merits, we need not address this alternative argument.

pilots (the "CBA").[2]  The CBA, as relevant here, provided that pilots' employment opportunities, including, for example, domicile location and flying schedules, were to be determined by their seniority ranking.  It also provided that a Master Executive Council (the "MEC"), comprised of AirTran pilots elected by pilot members, would act on behalf of ALPA in employment matters with AirTran.  Southwest, as a successor to AirTran, agreed to be bound by the CBA.

In the fall of 2010, the MEC appointed a Merger Committee (the "AirTran Merger Committee") to act on ALPA's behalf in negotiations with SWAPA to combine the two airlines' pilot seniority lists.  SWAPA formed a sister committee to do the same on its behalf (the "Southwest Merger Committee") (collectively, the "Merger Committees").  In early 2011, the two Merger Committees reached a "Process Agreement" under which both committees agreed to pursue three avenues for integration of the seniority lists:  (1) negotiations; (2) mediation, if negotiations failed; and (3) arbitration, in the event both alternatives failed.  The Process Agreement also memorialized the mutual understanding of SWAPA and ALPA that the integration process would be completed in three steps:  (1) negotiation and production of a tentative agreement by the Merger Committees; (2) consideration and acceptance of the tentative agreement by ALPA's MEC and SWAPA's

---

[2] In reviewing the district court's grant of summary judgment in favor of ALPA, we recite the facts in the light most favorable to the Pilots, the non-moving party.  *See infra* Part II.  The facts that follow are undisputed unless otherwise noted.

3

equivalent, its Board of Directors ("BOD"); and (3) if both of these governing bodies approved, ratification by the pilots of each airline.[3]  Southwest agreed to accept the seniority integration list created pursuant to the Process Agreement.

The Merger Committees began negotiations in the spring of 2011. Southwest joined the negotiations sometime in the early summer, and on July 12, 2011, Southwest presented the Merger Committees with a proposed comprehensive integration agreement (the "Comprehensive Agreement"), containing a proposed integrated pilot seniority list and changes to the CBA, including pay raises for AirTran pilots.  The AirTran Merger Committee brought the Comprehensive Agreement to the MEC, which found it unacceptable, a message that was relayed to Southwest.  Southwest executives thereafter requested a meeting with the MEC and the AirTran Merger Committee.  That meeting took place on July 14, 2011 at Southwest's corporate headquarters and was attended by all members of the MEC, members of both Merger Committees, and a number of Southwest executives including CEO Gary Kelly.

Mr. Kelly spoke to the meeting attendees about the need to reach agreement. The parties do not dispute that, as the district court described, Mr. Kelly expressed a desire to have the pilots vote on an integration agreement; concerns with

---

[3] The Pilots originally argued before the district court that any tentative agreement the Merger Committees proposed was required to be submitted to the pilots for consideration, essentially combining the second and third steps of the Process Agreement.  The district court rejected this claim as baseless, and the Pilots do not attempt to revive it on appeal.  We therefore do not address it.

4

AirTran's Boeing 717 aircraft fleet and potential future fuel cost increases; and a general intent to integrate the two airlines.  The parties also do not dispute that at least some meeting attendees recalled Mr. Kelly discussing an alternative to integration, a so-called "Plan B."  What the parties do dispute is the import of Mr. Kelly's comments.  The Pilots contend that Mr. Kelly's discussion contained threats to the job security and salary parity of AirTran pilots.  According to the Pilots, Mr. Kelly expressed disfavor of the Boeing 717 fleet, noted that a fuel price spike could threaten pay parity for AirTran pilots, and emphasized that a Plan B likely would be less favorable to AirTran pilots and might involve arbitration.  ALPA acknowledges that some meeting attendees perceived Mr. Kelly's references to a Plan B as a threat to the integration process, but it points to evidence that other attendees noted Mr. Kelly continually walked back any threats with assurances that he favored integration.

The Merger Committees continued negotiations after the July 14 meeting.  Together, they arrived at a Second Proposed Comprehensive Agreement.  This agreement, although less favorable vis-a-vis the pilots' seniority lists, was acceptable to the AirTran Merger Committee because of other favorable terms, including salary increases.  The Second Proposed Comprehensive Agreement reaffirmed the Process Agreement's three-step ratification process:  (1) negotiation between and agreement by the Merger Committees; (2) submission to and approval

5

of ALPA's MEC and Southwest's BOD; and (3) after these approvals, submission to the airlines' pilots for ratification.

Over the next few weeks, the Merger Committees converted the Second Proposed Comprehensive Agreement into a number of separate documents (collectively, "Integration Agreement 1"), including "Side Letter 9," which set forth the new integrated pilot seniority list and changes to the CBA that would incorporate both airlines' pilots. SWAPA's BOD approved Side Letter 9, and the next day pilots from both airlines could view the proposed combined seniority list on ALPA's website. Days later, the entire Integration Agreement 1 was posted to the website, where it was accessible to all AirTran pilots.

The parties agree that ALPA's MEC received substantial feedback from pilots regarding Integration Agreement 1 in person and via phone, email, and online forum postings. Although the Pilots emphasize that many AirTran pilots had favorable views of the proposed deal, it is undisputed that the pilots were not unanimously in favor of it. The MEC held a series of meetings from August 16 to 18, 2011 to debate Integration Agreement 1. The meetings included closed sessions (attended by MEC and AirTran Merger Committee members and advisors) and an open forum attended by some 200 AirTran pilots. The AirTran Merger Committee presented information to the pilots in attendance at this forum regarding risks associated with accepting or rejecting Integration Agreement 1.

6

The pilots in attendance were presented with a series of PowerPoint slides entitled "Risk," which informed them that, at the July 14 meeting with Southwest executives, the "concerns and risks of not reaching agreement and for management to make an overall proposal to resolve seniority and contractual issues . . . were given specific voice in this instance by [Southwest] management."  Doc. 21-11 at 51.[4]  The slides noted that AirTran officials "who were present [at the July 14 meeting] agree on their recollections in some instances, and disagree in other instances, on the precise words used by [Southwest] senior managers and what was meant by the use of some of those words."  *Id.*  "But all present agree[d] that Gary Kelly highlighted risks of not reaching agreement including the following:"

> Questions about whether AirTran and Southwest operations would be integrated or whether the integration could be delayed; The operation of AirTran [Boeing] 717s could be reduced or eliminated; The economic picture or fuel prices could influence [Southwest's] willingness to provide the economic benefits or protection that it was willing to offer with a consensual deal; and Previous mergers show that many different results were possible.

*Id.* at 52.  The Risk slides stated that, although "MEC members who were present in some cases assess those risks differently and have different levels of concerns about them, we all believe that AirTran members deserve to hear the same information presented to us and make a risk assessment for themselves related to the same issues."  *Id.*  The PowerPoint presentation also discussed the risks of

---

[4] "Doc." refers to the docket entry in the district court record in this case.

arbitration, with a bottom line statement: "Most important: The absolute assurance of a prompt and complete integration [with Southwest] may not be available after arbitration, depending on the result." *Id.* at 66.

The AirTran pilots in attendance expressed differing views about Integration Agreement 1. MEC members Christine Janning, Jeffrey Mertens, and James Sullivan testified that the weight of pilot sentiment was against the deal; other MEC members testified that the pilots' views varied widely. It is undisputed that a number of the MEC members themselves remained conflicted about the correct decision right up until the formal vote. When the formal vote occurred, MEC members voted 7 to 1 to reject Integration Agreement 1.

Because the MEC members rejected Integration Agreement 1, in keeping with the Process Agreement, it never was submitted to the AirTran pilots for a ratification vote. Instead, the AirTran Merger Committee went back to the drawing board with the Southwest Merger Committee.

On August 21, 2011, Southwest formally withdrew its agreement to Integration Agreement 1. The following day, Mr. Kelly wrote an open letter to the pilots of both airlines reporting the withdrawal and stating that, because a negotiated deal had not been reached, "[Southwest] will continue to consider all other options, in addition to arbitration. . . . Due to the worsened economic environment this summer, coupled with the fact that the [Integration Agreement 1]

8

can no longer be expedited, we cannot afford the previous offer."  Kelly Letter, Doc. 21-16 at 2.  Mr. Kelly went on to say:  "We made it clear that if an expedited agreement could not be reached, we would revaluate [sic] our plan in light of worsening economic conditions. . . .   Simply put, reevaluating the integration plan is mandatory in this economic climate."  *Id.*

In the days that followed, a number of AirTran pilots contacted ALPA's MEC and urged the committee members craft another agreement and submit it to the pilots for a ratification vote.  In response, the MEC passed a resolution indicating that it would submit the Merger Committees' next proposal to the pilots for ratification.  On September 1, 2011, Southwest presented another proposal to the Merger Committees ("Integration Agreement 2").  The proposal was less favorable to AirTran pilots than Integration Agreement 1 because, although the seniority list remained substantially the same, other employment benefits in Integration Agreement 1 were removed.  Because Southwest insisted that the MEC submit Integration Agreement 2 to the AirTran pilots and because the MEC itself had agreed to do so, MEC approved Integration Agreement 2 on September 21, 2011.

That month, Southwest continued to push ALPA on the deal.  Southwest informed the AirTran Merger Committee that it had assigned a number of individuals to work on development of a Plan B in the event Integration Agreement

9

2 was not ratified. In October, after the voting period for pilot ratification opened, *The Atlanta Journal-Constitution* published an article about Southwest's Plan B, including the possibility that the airlines would not fully integrate or may proceed to arbitration. The following month, the AirTran pilots ratified Integration Agreement 2.

The Pilots brought a nine count complaint against ALPA, alleging that ALPA breached its duty of fair representation. They alleged jurisdiction under the Labor Management Relations Act, the Labor Management Reporting Disclosure Act, and the Railway Labor Act, which together govern a labor union's duties during negotiations on behalf of employees. The district court distilled the Pilots' claims into two alleged breaches.[5] First, the Pilots contend that ALPA acted in bad faith by either failing to disclose or misrepresenting information to AirTran pilots about Integration Agreement 1 and comments made by Mr. Kelly and other Southwest officials regarding the integration process. Second, the Pilots assert that ALPA acted arbitrarily by failing to submit Integration Agreement 1 to a pilot ratification vote and by ultimately approving a less favorable integration agreement.

The district court granted summary judgment in favor of ALPA on all claims, concluding that the Pilots failed to demonstrate a triable issue of fact

_____

[5] The Pilots do not quibble with the district court's characterization of their claims.

10

regarding the causal connection between ALPA's allegedly bad faith conduct and the Pilots' asserted injury or the existence of any arbitrary conduct. The Pilots now appeal.

## II.

We review the district court's summary adjudication *de novo*, drawing all inferences and reviewing all evidence in the light most favorable to the non-moving party. *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." *Moton*, 631 F.3d at 1341 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the nonmovant "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]e may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied." *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 613 (11th Cir. 1995).

## III.

11

The Railway Labor Act ("RLA"), originally passed in 1926, was enacted in part "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein." 45 U.S.C. § 151a. To achieve this purpose, the RLA imposes a duty upon "all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise." *Id.* § 152. This section, which has been extended to the airline industry, imposes a legal duty upon parties to bargain in good faith. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1304 (11th Cir. 2001). Implicit in this duty to bargain in good faith is a duty of fair representation. *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 201-02 (1944).

Significantly, "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78 (1991). "Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature." *Id.* "Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.*; *see also Ford Motor Co. v.*

12

*Huffman*, 345 U.S. 330, 339 (1953) (recognizing the "wide range of reasonableness" that courts must allow "a . . . bargaining representative in serving the unit it represents"). Courts evaluating the actions of a labor union, even at the summary judgment stage, must take into account "the strong policy favoring the peaceful settlement of labor disputes" and must "evaluat[e] the rationality of a union's decision in light of both the facts and the legal climate that confronted the negotiators at the time the decision was made." *O'Neill*, 499 U.S. at 78.

A union breaches its duty of fair representation if it acts in bad faith, engages in arbitrary conduct, or directs a discriminatory animus toward a group of represented employees. *Id.* at 67. The Pilots alleged only bad faith and arbitrary conduct. The district court concluded that they failed to demonstrate a genuine issue of material fact regarding either claim. For the reasons below, we agree.

### A. The Pilots' allegations that ALPA acted in bad faith

The Pilots alleged that ALPA acted in bad faith in violation of its duty of fair representation by either failing to disclose or misrepresenting information to AirTran pilots about Integration Agreement 1 and comments Mr. Kelly and other Southwest officials made regarding the integration process. The district court rejected the Pilots' challenge, concluding that any causal connection between ALPA's alleged failure to disclose or misrepresentations and the chance of pilot

13

ratification was too attenuated.  On appeal, the Pilots argue that the district court employed too strict a causation requirement at the summary judgment stage.

We need not decide whether the district court's causation analysis was correct, however, because we conclude the Pilots failed to demonstrate a genuine issue of material fact regarding any bad faith by ALPA.  *See Local No. 48, United Bhd. of Carpenters & Joiners of Am. v. United Bhd. of Carpenters & Joiners of Am.*, 920 F.2d 1047, 1054 (1st Cir. 1990) (noting that a union may act in bad faith when it acts in an intentionally misleading or deceiving manner).  The Pilots contend that ALPA failed to publicize Mr. Kelly's and other Southwest executives' comments from the July 14, 2011 meeting regarding a Plan B or the possibility of non-integration, but ALPA has shown that it did in fact disseminate this information.  The PowerPoint presentation that ALPA officials showed to AirTran pilots at the August open forum explained in detail the MEC's understanding of Mr. Kelly's comments and the implications of failure to reach a deal.[6]  The PowerPoint slides did not call non-integration "Plan B," but the substance of the alternative to integration was presented to the pilots.

---

[6] In summary judgment briefing, the Pilots cited specifically only to Mr. Kelly's comments in arguing that ALPA purportedly failed to disclose facts regarding non-integration to AirTran Pilots; thus, the district court did not err in failing to consider comments made by any other Southwest executives. *See Stewart v. Dep't of Health & Human Servs.*, 26 F.3d 115, 115 (11th Cir. 1994) ("As a general principle, this court will not address an argument that has not been raised in the district court.  Judicial economy is served and prejudice is avoided by binding the parties to the facts presented and the theories argued below." (internal quotation marks and citation omitted)).

14

It is true that the AirTran pilots were presented with differing viewpoints, but this information accurately reflected the MEC members' diverging recollections of Mr. Kelly's statements. The Pilots contend that the views of Tim Baker, a MEC member who took notes at the July 14 meeting, should control. But even if we assume Mr. Baker was precisely correct in interpreting the import of Mr. Kelly's comments, his notes and impressions cannot form the basis of a misrepresentation or failure to disclose claim. Indeed, his views—and the views of MEC members who disagreed with his interpretation of what occurred at the July meeting—were presented to AirTran pilots at the August meeting. This disclosure demonstrates ALPA's intent to fully inform the pilots, the very opposite of improper intent, purpose, or motive.

The Pilots further contend that ALPA's failure to circulate the terms and conditions of Integration Agreement 1 prevented a groundswell of support from AirTran pilots, the result of which would have been ratification. But again, the Pilots overlook the fact that the terms and conditions were circulated and discussed with pilots prior to the MEC's vote, via an online posting and the PowerPoint presentation, and yet AirTran pilots did not respond with a unified front of support. We, like the district court, remain unpersuaded that the Pilots have created a

15

genuine issue of material fact on their bad faith claim.  We accordingly affirm the district court's summary judgment in favor of ALPA on these claims.[7]

### B.  The Pilots' allegations that ALPA's actions were arbitrary

A union's actions are arbitrary only if, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational."  *O'Neill*, 499 U.S. at 67 (internal quotation marks and citation omitted).  A union's actions are not arbitrary even if its "judgments are ultimately wrong."  *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998).

The Pilots argued that ALPA acted arbitrarily by not submitting Integration Agreement 1 to a pilot ratification vote and by ultimately approving a less favorable integration agreement.  The district court rejected this assertion, concluding that ALPA's decisions were reasonable.  ALPA followed the terms of the Process Agreement, which permitted submission of an agreement to the

---

[7] The Pilots argue that Todd Ortscheid, an AirTran pilot and ALPA National Executive Vice President, steamrolled the integration process by "serving as ghostwriter for MEC Member [Anthony] Chilla (giving false assurances [Southwest] did not threaten [AirTran] pilots) . . . , briefly as MEC executive administrator and interim communications chairman, and unrelenting foe of negotiated agreement with [Southwest]."  Appellants' Br. at 10.  But as ALPA points out, Mr. Chilla testified at his deposition that the letter about which the Pilots complain accurately reflected his views.  The Pilots also argue that Mr. Ortscheid demanded that he be involved in MEC discussions, but it is also undisputed that he was invited to attend these meetings.  In any event, because we conclude that ALPA informed the AirTran pilots of the benefits and risks of accepting or rejecting Integration Agreement 1, any internal struggles regarding whether to so inform the pilots is inapposite.  Accordingly, we agree with the district court that the Pilots' assertions regarding Mr. Ortscheid's interference do not create a genuine issue of material fact sufficient to defeat summary judgment.

16

AirTran pilots for ratification only once the agreement was approved by the MEC. Furthermore, the district court concluded, the MEC's rejection of Integration Agreement 1 was not arbitrary because "the Court can imagine that ALPA may have rejected [it] after concluding that the benefits and conditions offered . . . did not outweigh the proposed seniority list, which could have been seen as unfavorable to the AirTran pilots."  Summary Judgment Order, Doc. 44 at 26-27. "Moreover, circumstances changed between the MEC's rejection of Integration Agreement #1 and may have contributed to the pilots' ratification of the less favorable Integration Agreement #2," including Mr. Kelly's open letter to AirTran and Southwest pilots, the publicizing of a possible Plan B in the Atlanta newspaper, and the passage of time.  *Id.*  And that the mere fact that Integration Agreement 2 was less favorable was insufficient to show arbitrary conduct.

On appeal, the Pilots contend the district court failed to view disputed facts in the light most favorable to them and that it drew inferences in favor of ALPA. The district court's conclusion that it "c[ould] imagine" legitimate reasons for the MEC's rejection of Integration Agreement 1, the Pilots assert, demonstrates that a genuine issue of material fact remained regarding whether ALPA violated its duty of fair representation by engaging in arbitrary conduct.  We disagree.

In *O'Neill*, a case also involving ALPA and an alleged breach of its duty of fair representation, the Supreme Court conducted just such an analysis in

17

reviewing the lower courts' decisions regarding ALPA's entitlement to summary judgment.  In that case, Continental Airlines filed for bankruptcy protection and repudiated its collective bargaining agreement with ALPA, unilaterally slashing pilot salaries and benefits.  499 U.S. at 68.  ALPA responded by calling a strike that lasted over two years and ultimately by filing an adversary proceeding in Continental Airlines' bankruptcy case.  *Id.*  In the context of the adversary proceeding, Continental offered ALPA pilots a deal that included a provision for over 400 future pilot positions.  ALPA authorized striking pilots to submit bids for the open positions, but Continental challenged the strikers' bids in court and announced that all 400 positions had been awarded to non-striking pilots.  *Id.* at 69.

In response, ALPA ramped up its settlement negotiations with Continental and, ultimately, the two entities arrived at a deal that gave some strikers pilot positions, but gave non-striking pilots far better employment opportunities and benefits.  The deal laid out three options for striking pilots:  (1) an opportunity to fill one of over 400 future pilot positions, provided the striking pilot settled all outstanding claims with Continental; (2) a severance payment if the striking pilot elected not to return to work; or (3) for those pilots who retained individual claims against Continental, an opportunity to return to work only after the first option pilots had been reinstated.  *Id.* at 69-70.   Several pilots sued and, after the district

18

court granted summary judgment in favor of ALPA, the court of appeals reversed. *Id.* at 70-72.

The Supreme Court reversed the court of appeals. It assumed, as the court of appeals did, that ALPA's settlement was a bad deal (or, at least, was worse than a unilateral offer to return voluntarily to work) but concluded, "in light of the legal landscape at the time of the settlement," that the settlement was not illogical given Continental's statement that it had awarded the pilot positions to non-striking pilots. *Id.* at 79. Moreover, the Court said, "[g]iven the background of determined resistance by Continental at all stages of this strike, *it would certainly have been rational* for ALPA to recognize the possibility that an attempted [unconditional offer to] voluntary[ily] return to work would merely precipitate litigation over the right to the . . . bid positions." *Id.* at 80 (emphasis added). "Because such a return would not have disposed of any of the individual claims of the pilots who ultimately elected option one or option two of the settlement, *there was certainly a realistic possibility* that Continental would not abandon its bargaining position without a complete settlement." *Id.* (emphasis added).

In other words, the Supreme Court hypothesized as to what pressures weighed on ALPA and why ALPA's response to those pressures would have been rational, just as the district court did in this case. Indeed, given the deference courts must afford to union decisions and the heavy burden a party must carry to

19

demonstrate arbitrary conduct, the Pilots cannot establish the existence of a disputed material fact provided there is a rational reason for ALPA's decision. And we agree with the district court that there was. ALPA's failure to submit Integration Agreement 1 to a pilot ratification vote, one of the alleged arbitrary decisions, was prohibited by ALPA's Process Agreement that governed the ratification process.[8] ALPA's MEC rejected Integration Agreement 1, which had some favorable terms and conditions but an admittedly lackluster seniority list, among mixed reviews from AirTran pilots—even when the pilots were informed of the risks of failing to arrive at a negotiated deal. By the time the MEC considered Integration Agreement 2, the negotiation climate had changed. Mr. Kelly had penned an open letter to the pilots bemoaning the failure to come to an agreement and emphasizing the possibility of alternative options. The AirTran pilots and the MEC evidently perceived this letter as a more substantial threat than Mr. Kelly's previous statements and, as a result, pushed hard for ratification. Considering the climate in which these events occurred, ALPA's decision to submit Integration

_____

[8] And the MEC's failure to approve the agreement, the result of a 7 to 1 vote, also was not arbitrary as the Pilots suggest. It is undisputed that several MEC members remained undecided regarding whether to vote in favor of Integration Agreement 1 until the moment of the vote. The fact that the result of this vote was different from an earlier straw poll is insufficient to create a triable issue of fact. Moreover, the fact that MEC member Jeffrey Mertens called the MEC chairman to break what Mr. Mertens believed would be a tie and then subsequently switched his vote to avoid a tie does not demonstrate arbitrariness because Mr. Mertens provided a rational reason for his changed mind: he felt he "need[ed] to make a decision . . . based on what . . . is best for the pilots" and did not want to "just punt this to" the MEC chairman. Mertens Deposition, Doc. 35 at 89-91. The Pilots cannot create a genuine issue of material fact regarding the propriety of Mr. Mertens's vote by speculating as to how his motives may have been different from those to which he testified.

Agreement 2 to a pilot ratification vote after failing to submit the first was wholly rational. All that remains is the fact that Integration Agreement 2 was a worse deal for AirTran pilots, and that alone is insufficient as a matter of law to amount to arbitrariness. *See O'Neill*, 499 U.S. at 78-79.

## IV.

The Supreme Court has admonished that courts must not substitute their judgment for that of a labor union, even when, as here, the union reaches a less favorable deal than what was possible. The Pilots have failed to establish that their union's conduct fell outside the wide range of reasonableness we must afford it. Thus, as a matter of law, ALPA did not breach its duty to fairly represent AirTran pilots. The district court correctly granted summary judgment in favor of ALPA.

**AFFIRMED.**