**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AIRCRAFT SERVICE INTERNATIONAL INC., | No. 12-36026 |
| *Plaintiff-Appellee*, | D.C. No. 2:12-cv-01729-JLR |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS AFL CIO LOCAL 117, *Defendant*, | OPINION |
| and | |
| WORKING WASHINGTON; ALEX POPESCU; JONATHAN ROSENBLUM, *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
July 8, 2013—Seattle, Washington

Filed January 10, 2014

Before: Andrew J. Kleinfeld, Milan D. Smith, Jr.,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Labor Law

The panel affirmed the district court's issuance of a preliminary strike injunction brought under the Railway Labor Act against "carrier employees" of an aircraft service provider.

The panel held that the Norris-LaGuardia Act did not withdraw jurisdiction from the district court to enjoin the strike, which grew out of a labor dispute, because the Railway Labor Act is recognized as an exception to the NLGA's jurisdiction-stripping provisions.

The panel concluded that the carrier employees had an enforceable duty under section 2 First of the RLA to diligently strive to make and maintain agreements and settle all disputes. The panel held that section 2 First does not merely set forth a policy and does not apply only to unionized carrier employees. The panel held that the employees' decision to strike before appointing a representative and attempting to collectively bargain under the procedures of the RLA was a violation of their duty in section 2 First. Accordingly, the district court's exercise of jurisdiction was proper.

The panel held that the strike injunction was not overbroad in violation of the First Amendment. Given the district court's reasonable finding that the balance of the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

equities favored the employer because permitting the strike would essentially shut down an airport, the panel held that preliminarily enjoining the employees' strike was not an abuse of discretion.

Dissenting, Judge M. Smith wrote that the injunction should be vacated because the employees violated no express provision of the RLA, and before seeking an injunction, the employer failed to satisfy the condition precedent in section 8 of the NLGA by failing first to make all reasonable effort to settle the parties' dispute.

## COUNSEL

Dmitri Iglitzin, Schwerin Campbell Barnard Iglitzin & Lavitt, LLP, Seattle, Washington; David P. Dean (argued), Kathy L. Krieger, Darin M. Dalmat, and Daniel M. Rosenthal, James & Hoffman, P.C., Washington, D.C., for Defendants-Appellants.

Douglas W. Hall, FordHarrison LLP, Washington, D.C., for Plaintiff-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

To avoid interruptions to interstate commerce, the Railway Labor Act treats labor relations in the national transportation industry differently from more generally applicable labor law. Section 152 First of the Railway Labor Act, 45 U.S.C. § 152 First ("section 2 First"), imposes a duty

on all carrier employees to engage in the Act's labor dispute resolution procedures before ceasing to perform their work. Because the employees of Aircraft Service International are carrier employees, they must comply with the Act. Because they are subject to this obligation, the district court did not abuse its discretion in issuing the strike injunction. The injunction did not violate the employees' or other defendants' First Amendment rights; it furthered the important governmental interest of regulating the economic relationship between labor and management and was no greater than essential to the furtherance of that interest.

## Facts and Procedural History

Air Craft Service International, Inc., doing business as Air Craft Service International Group ("ASIG"), provides air craft services at Seattle-Tacoma International Airport ("Sea-Tac"). As part of such services, ASIG refuels approximately 75 percent of the airplanes at Sea-Tac.

On September 14, 2012, ASIG indefinitely suspended one of its employees, Alex Popescu. The parties dispute the reasons for his suspension. ASIG alleges it suspended Popescu for "inappropriate behavior, including screaming obscenities at his supervisor." Popescu and other ASIG employees counter that he was suspended "in retaliation for his leadership on workplace safety issues, including testifying at a public hearing for the Seattle Port Commission." The Seattle Port Commission hearing was held two days prior to his suspension and was Popescu's second appearance before the Commission.

After Popescu's suspension, other ASIG employees at Sea-Tac ("Employees") decided to organize "a group

response" to advocate for Popescu's reinstatement. In organizing this response, Jonathan Rosenblum of Working Washington[1] became heavily involved in this employer/employee dispute. After approximately two weeks of failed efforts to gain Popescu's reinstatement, the Employees decided "by an overwhelming majority" to strike for up to eight hours on some future date.

Working Washington announced the Employees' decision to strike at an October 3, 2012 press conference, even though no strike date was set. After the press conference, ASIG immediately filed a complaint in the United States District Court for the Western District of Washington against the International Brotherhood of Teamsters' local chapter, Teamsters Local 117;[2] Working Washington; Jonathan Rosenblum; Alex Popescu; and unnamed ASIG employees. In the complaint, ASIG requested a temporary restraining

---

[1] Jonathan Rosenblum has been "a union and community organizer since 1984." During the time of this dispute, he functioned as the Campaign Director for Working Washington.

Working Washington describes itself as "a coalition of individuals, neighborhood associations, immigrant groups, labor unions, civil rights organizations, and people of faith united in support of quality jobs and a fair economy." Working Washington claims extensive ties to various employee groups at Sea-Tac, including baggage handlers, passenger service workers, ground transportation employees, taxicab drivers, cargo handlers, and fuelers. It has organized various efforts "to advocate for safety and respect on the job" at Sea-Tac, among other places.

Working Washington is not a labor union and has not been selected by ASIG's Employees to represent them.

[2] Teamsters Local 117 was initially implicated in ASIG's complaint, though eventually the parties stipulated to its dismissal.

order, a preliminary injunction, and a declaratory judgment for a permanent injunction to enjoin the strike as unlawful under the Railway Labor Act ("RLA").

The district court issued a temporary restraining order on October 5, 2012, prohibiting all Defendants from striking or encouraging a strike at Sea-Tac. The order sought to "maintain the *status quo* pending the outcome of a hearing to determine whether a preliminary injunction should issue." After a full hearing on October 17, 2012, the district court concluded that preliminary injunctive relief was proper, applying the factors in *Winter v. Natural Resources Defense Counsel*, 555 U.S. 7, 20 (2008). The Court issued the following strike injunction:

> Alex Popescu, Working Washington, Jonathan Rosenblum, and John Does 1-100, and their officers, agents, employees, and members are hereby preliminarily enjoined from in any manner or by any means directing, calling, causing, authorizing, inducing, instigating, conducting, continuing, encouraging, or engaging in any strike, work stoppage, sick-out, slow-down, work-to-rule campaign, or other concerted action in violation of the RLA which is intended to interfere with [ASIG's] normal operations.

(footnote omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Winter*, 555 U.S. at 20. Reviewing the district court decision as to the first *Winter* factor, the district court reasoned that the text and purposes of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* (in particular section 2 First), support ASIG's position that air carrier "employees are never permitted to strike as a first step." The district court also concluded the second factor was satisfied, "because the threat of irreparable harm is largely self-evident from the underlying facts of the case. In essence, Defendants are threatening to shut down SeaTac Airport." In balancing the equities, the district court found for ASIG, as "[a]n improperly granted injunction would . . . merely delay[] resolution of [the Defendants'] dispute with [ASIG]." *Id.* Finally, the court reasoned that the fourth *Winter* factor favored ASIG: "an unlawful strike would plainly be contrary to the public interest," while "an injunction might prevent commerce from being severely disrupted."

Popescu, Rosenblum, and Working Washington appealed the temporary restraining order and preliminary strike injunction. In the appeal, they challenge the district court's exercise of jurisdiction over the dispute. They also contend the breadth of the injunction violates their First Amendment rights.

### Standard of Review

"We review de novo a district court's exercise of subject matter jurisdiction." *Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 707 (9th Cir. 2000). If we find the district court properly exercised jurisdiction, we will "review the district court's decision to grant . . . a preliminary injunction for abuse of discretion. Our review is limited and deferential." *Sw. Voter Registration*

*Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (internal citations omitted). That being said, "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review." *Id.* In sum, the preliminary injunction will be upheld unless the district court "abused its discretion or based its decision on an erroneous legal standard or clearly erroneous findings of fact." *E.E.O.C. v. Recruit U.S.A., Inc.*, 939 F.2d 746, 751 (9th Cir. 1991).

## Discussion

## I. The Federal District Court has Jurisdiction over this Labor Dispute

Generally, the Norris-LaGuardia Act ("NLGA") withdraws jurisdiction from federal courts to enjoin strikes "growing out of any labor dispute." 29 U.S.C. § 104(a). Enacted in 1932, the NLGA "was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining." *Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co.*, 353 U.S. 30, 40 (1957). Thus, "Congress acted to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital." *Id.*

However, the NLGA "does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act." *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 445 (1987) (quotation marks omitted). Though enacted six years prior to the NLGA, the RLA has been recognized as an exception to the NLGA's jurisdiction stripping provisions, because Congress sought to "channel[] the[] economic forces" the NLGA sought to protect, "in matters dealing with railway labor, into special

processes. . . ." *Bhd. of R.R. Trainmen v. Chicago River & Ind. R. Co.*, 353 U.S. at 41. This channeling recognized "the failure of voluntary machinery to resolve a large number" of railway labor disputes "serious enough to threaten disruption of transportation." *Id.* at 40. Indeed, Congress enacted the RLA after "decades of labor unrest that persistently revealed the shortcomings of every legislative attempt to address the problems." *Burlington N. R.R. Co.*, 481 U.S. at 444. Through the Act, Congress sought to "protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce through failures of managers and employees to settle peaceably their controversies." *Union Pac. R.R. Co. v. Price*, 360 U.S. 601, 609 (1959) (quoting H.R. Rep. No. 328, 69th Cong., 1st Sess., p.1).

Only ten years after its enactment, Congress "extended [the RLA] in 1936 to cover the airline industry." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994) (citing 45 U.S.C. §§181–188). Congress's "general aim was to extend to air carriers and their employees the same benefits and obligations available and applicable in the railroad industry."[3] *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963). This move aligned with Congress's longstanding concern of "minimizing interruptions in the Nation's transportation services by strikes and labor disputes." *Id.* at 687.

---

[3] "The 1936 amendments made applicable to the airlines all of the provisions of the Railway Labor Act, excepting § 3, 45 U.S.C. § 153, dealing with the National Railroad Adjustment Board." *Int'l Ass'n of Machinists v. Cent. Airlines*, 372 U.S. 682, 685 (1963). Section 3 is not relevant to this case.

Given this history, the RLA "cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve." *Burlington N. R.R. Co.*, 481 U.S. at 444. Congress explicitly stated the RLA's purposes in the text of the statute itself:

> (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a. First and foremost, Congress was concerned about preventing "any" interruptions to interstate commerce, because of the pivotal role that railways and air carriers play in the national economy. *Id.* Further, Congress made clear its interest in "prompt and orderly" resolution of "all" labor disputes. *Id.* In sum, Congress enacted the RLA to eliminate interruptions to interstate commerce caused by labor disputes between carriers and their employees.

These purposes find application in section 2 First of the RLA, wherein Congress mandated that:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First.

Section 2 First imposes this duty on all carrier employees. Nothing in this section supports reading "all carriers['] . . . employees" to mean anything other than "all carriers' employees." In defining "employee" for purposes of the RLA, section 1 Fifth confirms this was Congress's intent: employee means "every person in the service of a carrier . . . who performs any work defined as that of an employee or subordinate official." *Id.* at § 151 Fifth. Considering this text, it is an inescapable conclusion that, when the RLA references all carrier employees, that is precisely what Congress meant. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." (internal quotation marks omitted)).

At oral argument before this panel, the Employees conceded they were carrier employees, as defined in the RLA. As far as section 2 First is concerned, that is the end of the matter. They have a duty to diligently strive to make and maintain agreements and settle all disputes. *See* 45 U.S.C. § 152 First. Striking without even attempting to appoint a representative and collectively bargain violates this duty. Here, the Employees have made no attempt to engage in the RLA's procedures—the very mechanism designed by Congress to resolve carrier labor disputes. *See Int'l Ass'n of Machinists v. State*, 367 U.S. 740, 760 (1961).

Notwithstanding the apparent clarity of this provision in its application to all carrier employees, the Employees argue the RLA does not provide federal jurisdiction over this dispute, because they have no enforceable duty under section 2 First. Instead, they first contend that section 2 First is only a policy, not an independent obligation. Second, they argue that, even if more than a policy, it only applies to unionized carrier employees.[4] Neither contention has merit.

The Employees first argue that section 2 First is a mere policy mobilized only by other RLA provisions. Their argument continues that the RLA's other provisions only address resolving disputes over forming collective agreements (major disputes), interpreting such agreements (minor disputes), and appointing a representative (representation disputes). *See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969) (major disputes); *Bhd. of R.R. Trainmen v. Chicago River & Ind.*

---

[4] ASIG's Employees are not unionized, and they have not selected Working Washington, which purports to speak for them, as their union or representative.

*R.R. Co.*, 353 U.S. at 33 (minor disputes); 45 U.S.C. § 152 Third, Fourth, and Ninth (representation disputes). Given their disinterest in all of the above, they argue the RLA does not compel them to do anything.

This argument is fatally flawed for two reasons. First, the *Chicago & North Western* Court *explicitly* rejected this narrow view of section 2 First previously advanced in *Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-Kan.-Tex. R.R. v. Mo.-Kan.-Tex. R. Co.*, 320 U.S. 323, 334 (1943) [hereinafter "*M-K-T*"]. *Chicago & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 578 (1971) ("In light of the place of § 2 First in the scheme of the Railway Labor Act, the legislative history of that section, and the decisions interpreting it, the passing reference to it in the M-K-T case cannot bear the weight which the Court of Appeals sought to place upon it.").[5] Instead of being "a mere statement of policy or exhortation to the parties," section 2 First "was designed to be a legal obligation." *Id.* at 577. This circuit has likewise found that section 2 First imposes an independent, mandatory duty enforceable by the courts. *See Reg'l Airline Pilots Ass'n v. Wings W. Airlines, Inc.*, 915 F.2d 1399, 1402–03 (9th Cir. 1990); *accord, e.g.*, *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1304–05 (11th Cir. 2001) ("It is clear that the substantive legal duty of 45 U.S.C. § 152 First, is a 'specific provision' of the RLA and, moreover, is central

---

[5] Our respected colleague's dissent fails to recognize this. Dissent at 33–34. We *are* "wholly rel[ying] on the Court's subsequent holding" in *Chicago & North Western*, dissent at 34, because that Court explicitly rejected the *M-K-T* Court's interpretation of section 2 First upon which the dissent so heavily relies. The *Chicago & North Western* Court also confirmed that *Virginian Railway Company v. System Federation No. 40*, 300 U.S. 515 (1937) "considered and affirmed" that section 2 First imposes an independent, enforceable duty. 402 U.S. at 579.

to the purpose and functioning of the RLA."); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Trans World Airlines, Inc.*, 839 F.2d 809, 814 (D.C. Cir. 1988) (recognizing section 2 First as an "independent duty").

Second, section 2 First's text also condemns the Employees' narrow view. All carrier employees have a specific duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to *settle all disputes*, whether arising out of the application of such agreements *or otherwise . . . .*" 45 U.S.C. § 152 First (emphasis added). Thus, carrier employees have a clear duty to "make" agreements, not just maintain preexisting ones. Perhaps this obligation could be cast as reaffirming the major and minor dispute resolution procedures for cases dealing with forming and interpreting collective agreements, respectively. But the presence of "or otherwise" demonstrates Congress's intent to require labor disputes to be settled even if they do not fit into the major or minor resolution mechanisms. *See Tabor v. Ulloa*, 323 F.2d 823, 824 (9th Cir. 1963) ("[A] legislature is presumed to have used no superfluous words."). Further, nothing in "or otherwise" limits its application to representation disputes only. Rather, "or otherwise" underscores the plain language in the obligation to "exert every reasonable effort" to "settle all disputes." 45 U.S.C. § 152 First.

Accordingly, section 2 First is more than a policy gloss on the RLA's other provisions. Section 1a sets forth the RLA's purposes and provides the policy. But in section 2, Congress enumerated duties, the first of which is section 2 First, "the heart of the Railway Labor Act." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. at 377–78. Congress

intended section 2 First to be taken at its terms as a duty. *See Satterfield*, 569 F.3d at 951.

The Second Circuit extended this line of reasoning in *Summit Airlines v. Teamsters Local Union No. 295*. 628 F.2d 787 (2d Cir. 1980). The airline refused to recognize a union as their employees' bargaining representative, and the union tried to force recognition through economic coercion. *Id.* at 789. When the airline sought injunctive relief under the RLA, the union argued that the court had no jurisdiction, because the union had not violated any duty in the RLA. *Id.* In rejecting this argument, the Second Circuit noted that section 2 First represented a "general obligation of both the carriers and their employees to attempt in good faith to resolve all disputes without resort to economic coercion." *Id.* Further, it found that the representation dispute resolution procedures of section 2 Ninth were compulsory, even though in that case the dispute was between the carrier and the employees rather than between competing employee representatives. *Id.* at 795 n.4. In so holding, the court reasoned that a contrary position would render sections 2 First and Ninth meaningless. *See id.* at 794–95. We find this reasoning persuasive and applicable to interpreting carrier employees' obligations under section 2 First; a legal obligation sufficient to channel carrier labor disputes into the RLA's various dispute resolution procedures. *See also e.g.*, *In re Nw. Airlines Corp.*, 483 F.3d 160, 168, 174–75 (2d Cir. 2007) (enjoining employees' strike even though the parties' CBA was abrogated in bankruptcy, because section 2 First is a separate duty that "operates independently of the RLA's status quo provisions").

In their second argument, the Employees contend that, even if section 2 First represents more than a policy, it only

applies to unionized carrier employees. This view is inconsistent with the text of section 2 First, which applies to "all carriers['] . . . employees." 45 U.S.C. § 152 First. While the import of this conclusion is to push carrier employees contemplating collective action into the RLA's procedures, such is as Congress intended.

The Supreme Court made clear that "Congress has given the unions a clearly defined and delineated role to play in effectuating the basic congressional policy of stabilizing labor relations in the industry." *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 760 (1961). "The Railway Labor Act was passed . . . to encourage collective bargaining by [carriers] and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." *Detroit & T.S.L.R. Co. v. United Transp. Union*, 396 U.S. 142, 148 (1969); *see also Tex. & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930) ("[T]he major purpose of Congress in passing the Railway Labor Act was to provide a machinery to prevent strikes." (internal quotation marks omitted)). Further, collective bargaining has been described as "*the* method of settling [carrier labor] disputes." *Int'l Ass'n of Machinists v. Street*, 367 U.S. at 760 (emphasis added). Thus, while the RLA "does not undertake to compel agreement between the employer and employees, . . . it does command those preliminary steps without which no agreement can be reached." *Virginian Ry.*, 300 U.S. at 548.

Furthermore, the Supreme Court and this circuit have plumbed the depths of section 2 First. It is not meant to reach disputes between a carrier and an individual employee. *See Hawaiian Airlines*, 512 U.S. at 255; *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 400 (1942). Similarly, section 2 First does not create a private right of action for employees

trying to force a union and carrier to comply with the RLA's procedures. *Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1022–23 (9th Cir. 1989). Congress instead meant the RLA for collective disputes directly between the carrier and its employees. *See id.* at 1022.

These decisions raise no red flags with respect to the interpretation of section 2 First here advanced. Section 2 First clearly applies to all carrier employees, and it imposes upon them an obligation to "exert every reasonable effort" to make labor agreements and settle labor disputes. The provisions of the RLA provide the preliminary mechanism for doing so. Failure to perceive this connection between section 2 First's duty and the RLA's procedures would allow carrier employees to leverage their critical role in interstate commerce and exploit it in their quest for concessions. Such would contravene the RLA's purposes, as clearly stated in the text. *See* 45 U.S.C. § 151a.

Therefore, the Employees' decision to strike before appointing a representative and attempting to collectively bargain under the procedures of the RLA is a violation of their duty in section 2 First. Instead, the Employees must appoint a representative according to section 2 Third, Fourth, and Ninth (if necessary).[6] With a representative, they can then get down to settling their dispute with ASIG and shouldering

---

[6] The dissent mischaracterizes our opinion as requiring unionization. Dissent at 33, 36, 37. The RLA's dispute resolution procedures can only be navigated by party representatives. *See e.g.*, 45 U.S.C. § 152 Second, Fourth, Sixth. Therefore, appointing a representative is required before carrier employees are permitted to strike. While the RLA does not require carrier employees to form or join a labor union, it does require them to appoint a representative before striking.

their duty under section 2 First.[7] Only if the parties properly proceed through the applicable RLA "procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute. . . ." *Burlington N. R.R. Co.*, 481 U.S. at 445; *see also* Paul M. Schmidt, Comment, Trans World Airlines v. Independent Federation of Flight Attendants: *Introducing a New Economic Weapon into the Labor Law Arena*, 38 U. Kan. L. Rev. 1061, 1079 (1990) ("Because the RLA was enacted out of a strong congressional concern for 'uninterrupted commerce,' procedural mechanisms were inserted in the RLA to achieve that end.").[8]

---

[7] Our dissenting colleague argues that we have created an "impossible burden" for the Employees, because (1) the National Mediation Board declined to mediate their dispute, dissent at 37–38, and (2) appointing a representative would be difficult, dissent at 38 n.11. However, the NMB did not decline to mediate, because the employees were incapable of appointing a representative. Dissent at 37. Instead, the NMB told the Employees that it only resolves disputes between "carriers and the designated bargaining representatives of their employees." Thus, the advice, that the NMB told the Employees, complies with the law as outlined herein.

Second, the dissent's concerns about the Employees' ability to appoint a representative are premature at this point in the dispute. The employees have not attempted to appoint one. Likewise, the dissent's citation to the NMB opinion, dissent at 38 n.11 (citing 40 NMB No. 13), ignores the fact that that case involved a representation dispute between two competing representatives. Predicting such a dispute would arise if the Employees attempt to appoint a representative is also premature.

[8] The dissent seems to argue that if section 2 First imposes this duty, the Employees have somehow satisfied it through seeking Rosenblum's reinstatement and asking the NMB to mediate their dispute. Dissent at 38. However, given the text, purposes, and structure of the RLA, these efforts do not satisfy their duty under section 2 First.

Finding certain aspects of the RLA compulsory is not unprecedented. *See e.g.*, *Bhd. of R.R. Trainmen v. Chicago R. & Ind. R.*, 353 U.S. at 39 (finding arbitration under section 3 compulsory); *Summit Airlines*, 628 F.2d at 794 (holding that section 2 Ninth is compulsory). Further, the facts of this case are distinguishable from the Fifth Circuit's discussion in *Russell v. Nat'l Mediation Bd.*, 714 F.2d 1332 (5th Cir. 1983). The Employees are not trying to deal individually with management. Rather, their decision to strike is the epitome of collective action. In *Russell*, the Fifth Circuit reversed a decision by the National Mediation Board denying certification to an individual as class representative of carrier employees. *Id.* at 1341. The Board denied the individual's application, because he planned to abrogate all existing collective bargaining agreements. *Id*. at 1336. In rejecting the Board's argument that section 2 First requires carrier employees to engage in collective bargaining, the court noted that the RLA "supports but does not require collective bargaining." *Id.* at 1343. Rather, "[i]f the employees do not wish to organize, prefer to deal individually with management . . . why, that course, is left open to them, or it should be." *Id.* (quoting H.R. 7650, House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess. 57 (1934)). In the instant case, however, the Employees are not attempting to deal individually with management; they intend to strike. When carrier employees have such an intention, they may do so only if they have followed the RLA and carried their duties under it. *Burlington N. R.R. Co.*, 481 U.S. at 445.

Further, our interpretation of the RLA does not permit "freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place." *Chicago & N.W.*, 402 U.S. at 583. In *Chicago &*

*North Western*, the Supreme Court underscored the propriety of a strike injunction where carrier employees are only "going through the motions" in complying with the RLA's procedures and yet threaten a strike. 402 U.S. at 575, 578. In such a circumstance, enjoining the strike would be "the only practical, effective means" to enforce compliance with section 2 First. *Id.* at 583.

Here, the Employees are unwilling to even "go through the motions" under the RLA; rather, they wish not to bargain but to strike. In so doing, they present the very situation for which Congress enacted the RLA: carrier employees collectively threatening a strike capable of single-handedly interrupting interstate commerce by shutting down an airport. *See e.g.*, *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. at 378 (A dispute that "threatens substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service" is of the kind envisioned by the Act to be enjoined. (internal quotation marks omitted)) (speaking in context of major dispute resolution procedures). The purposes of the RLA, as stated in the text, would be thwarted were the strike not enjoined. *See* 45 U.S.C. § 151a. Indeed, the formal procedures of the RLA were enacted to prevent this precise interruption to interstate commerce from occurring.

Accordingly, the district court's exercise of jurisdiction and issuance of the strike injunction are hardly "freewheeling"; they have the support of the RLA and Supreme Court and Ninth Circuit precedent. *See id*; *Chicago & N.W.*, 402 U.S. at 583; *Reg'l Airline Pilots Ass'n*, 915 F.2d at 1402 (Under the RLA, "the federal courts' obligation is to oversee the broad structure of the process and prevent major deviations. . . ."). Simply because a group of carrier

employees does not meet the typical unionized mold does not mean Congress intended their strike to be above the law.

Next, Appellants argue that, if the Employees were allowed to strike, ASIG would also be entitled to engage in self help, i.e., through firing employees or giving and then withdrawing concessions. But such an arrangement does not mean the RLA's purposes are being preserved or its text honored. It is hard to think of a situation in this context more harmful to interstate commerce.[9] Thus, we come full circle: in interpreting section 2 First, the RLA's text-based purposes illuminate its meaning. We are not second-guessing the text with snippets of drafters' comments. Rather, Congress chose to express its collective intent by specifying the Act's purposes in its text. Thus, any ambiguity in section 2 First can be resolved with a glance to the RLA's stated purposes. *See Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001). Specifically, finding no duty under the RLA applicable to the Employees here would offend the

---

[9] Furthermore, commentators and courts have recognized that the RLA's dispute resolution process "is 'purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute.'" Harvey R. Miller, Michele J. Meises, Christopher Marcus, *The State of the Unions in Reorganization and Restructuring Cases*, 15 Am. Bankr. Inst. L. Rev. 465, 470 (2007) (quoting *Bhd. of Ry. & S.S. Clerks v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 246 (1966)). "'[D]elaying the time when the parties can resort to self-help provides time for tempers to cool, helps create an atmosphere in which rational bargaining can occur, and permits the forces of public opinion to be mobilized in favor of a settlement without a strike or lockout.'" *Id.* at 471 (quoting *Detroit & Toledo Shore Line R.R. Co.*, 396 U.S. at 150). Permitting an immediate strike (and consequent interruption to interstate commerce), simply because carrier employees refuse to appoint a bargaining representative or make a collective bargaining agreement, is inconsistent with this aim of the RLA as well.

purposes of eliminating interruptions to interstate commerce and promptly settling all carrier labor disputes. It would also be inconsistent with section 2 First's text.

The employees contend that the dearth of cases like this one supports their interpretation of section 2 First. However, the fact, that neither the Supreme Court nor this circuit have ever directly answered the question posed by the parties, supports the result we reach. Disputes under the RLA usually involve carrier employees who have unionized or have at least appointed a representative. Indeed, a case like the instant one is rare. But this is probably because carrier employees usually unionize. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. at 750 (The "railway industry is marked . . . by a strong and long-standing tradition of voluntary unionism on the part of the standard rail unions."). The rarity of disputes like this one may also indicate that the RLA is accomplishing its purposes by channeling labor disputes through its procedures. The statutory text and case law confirm this was Congress's intent in enacting the RLA.

Finally, section Eight of the NLGA does not strip the district court of jurisdiction. Rather, it prohibits issuing a restraining order or injunction in favor of a:

> complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration.

29 U.S.C. § 108. Because a specific RLA duty applies in this controversy, the NLGA does not control its resolution. *See Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Execs. Ass'n*, 491 U.S. 490, 513 (1989) (District courts have "jurisdiction and power to issue necessary injunctive orders to enforce compliance with the requirements of the RLA notwithstanding the provisions of the Norris-LaGuardia Act." (internal quotation marks omitted)); *Burlington N. R.R. Co.*, 481 U.S. at 444–45 ("In certain limited circumstances, the Norris-LaGuardia Act does not prevent a court from enjoining violations of [a] specific mandate of [the RLA]."). Further, ASIG desires to resolve a dispute with its employees the way Congress intended—through the procedures of the RLA. Given our conclusion that the Employees have not carried their duty under the RLA, ASIG has shirked none of its duties. For both reasons, this provision does not alter our conclusion.

Accordingly, we find the district court's exercise of jurisdiction in this case proper, because the Employees are covered by the RLA and have a "legal obligation" with which they have not complied. *See Chicago & N.W.*, 402 U.S. at 577.

## II. Permissibility of the Strike Injunction vis-à-vis the First Amendment

The Employees and Working Washington contend the strike injunction, in its breadth, violates their First Amendment rights. In essence, they challenge the district court's application of the third *Winter* factor, balancing the equities. *See Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005).

However, given our conclusion that section 2 First imposes an obligation upon the Employees under the RLA, the district court may enjoin certain actions as unlawful. *See Burlington N. R.R.*, 481 U.S. at 455. More specifically, the Supreme Court has held that obligations imposed under section 2 First are "enforceable by whatever appropriate means might be developed on a case-by-case basis," including strike injunctions. *Chicago & N.W.*, 402 U.S. at 577, 583. Considering Congress enacted the RLA to "avoid any interruption to commerce or to the operation of any carrier engaged therein," 45 U.S.C. § 151a, and given the district court's reasonable finding that permitting the strike would essentially shut down the entire Sea-Tac Airport, enjoining the Employees' strike was not an abuse of discretion.

Further, we have been unable to identify any case in the Supreme Court or any of the courts of appeal invalidating a strike injunction (authorized under the RLA) because of First Amendment concerns. To the contrary, the Court has consistently found that actions inconsistent with national labor laws are generally not protected by the First Amendment. *See e.g.*, *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 226 (1982) (secondary boycott illegal under the NLRA warrants no First Amendment protection); *Int'l Bhd. of Elec. Workers v. N.L.R.B.*, 341 U.S. 694, 704 (1951) ("We find no indication that Congress thought that the kind of picketing and related conduct which was used in this case to induce or encourage a strike for an unlawful object was any less objectionable than engaging directly in that strike."); *accord Miller v. United Food & Commercial Workers Union*, 708 F.2d 467, 471 (9th Cir. 1983) ("Because of the government's strong interest in regulating the economic relationship between labor and

management, Congress may constitutionally enact measures which impact on the speech element of picketing."). In so holding, the Court has surmised that "conduct designed not to communicate but to coerce merits still less consideration under the First Amendment." *Int'l Longshoremen's Ass'n*, 456 U.S. at 226.

Nevertheless, "[t]he freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940). Indeed, "the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution." *Id.* at 102.

In *Miller v. United Food & Commercial Workers Union*, 708 F.2d at 472, this circuit held that a district court could enjoin informational picketing in the midst of a labor dispute, given the mixture of speech and conduct, if the injunction "furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." The relief should "promote[] the purposes of Congress without regard to the content of the ideas expressed." *Id.*

The speech-to-conduct ratio is lower in the context of a strike than in informational picketing. Further, nothing in the district court's preliminary injunction prohibits Popescu, the Employees, Working Washington and its members, or Rosenblum from "discuss[ing] publicly and truthfully" the

facts of the Employees' labor dispute with ASIG. The strike injunction merely prohibits the parties from striking or encouraging a strike at Sea-Tac.

The Employees and Working Washington contend this injunction impermissibly extends to "constitutionally protected speech, expressive activity and association— including, for example, rallies, public demonstrations, consumer boycotts, banners, signs, leaflets, petitions, press releases, news broadcasts, interviews, websites and social media—that could be construed as promoting or encouraging current or future group action by ASIG employees." However, the injunction, by its terms, fails to be as broad as the Employees and Working Washington make it out to be. Instead, the injunction is much more limited. Reading it plainly, the Employees cannot strike against ASIG, and neither they nor Working Washington may encourage as much. Other than that, the Employees and Working Washington may freely exercise their First Amendment rights in seeking better working conditions at ASIG and anywhere else. "There are many ways in which [Defendants] may express their opposition to [ASIG working conditions, etc.] without infringing upon the rights of others." *Int'l Longshoremen's Ass'n*, 456 U.S. at 227.

Therefore, the district court did not abuse its discretion in finding the balance of the equities favored ASIG and issuing the strike injunction.

## III.    Conclusion

Because the Employees have breached their duty under section 2 First of the RLA, the district court properly exercised jurisdiction and enjoined the Employees' strike.

The district court did not abuse its discretion in issuing the strike injunction against the Employees and Working Washington. The district court's judgment is therefore **AFFIRMED**.

---

M. SMITH, Circuit Judge, dissenting:

I respectfully dissent.[1]    The majority concludes that Section 2, First of the Railway Labor Act (RLA),[2] 45 U.S.C. § 152, First (Section 2, First), imposes an unprecedented, amorphous duty to refrain from striking on the Airline Services International fuellers (Fuellers), while imposing no duty to negotiate on Airline Services International (ASIG) before it sought the injunction at issue in this case, despite the clear language of Section 8 of the Norris LaGuardia Act (NLGA), 29 U.S.C. § 108.  The injunction upheld by the majority portends the reinsertion of federal courts into the "labor injunction business," *Marine Cooks & Stewards, AFL v. Pan. S.S. Co.*, 362 U.S. 365, 369 (1960), in violation of the language of the NLGA stripping federal courts of the

---

[1] Because I believe that the injunction must be vacated for the reasons set forth below, I express no opinion with respect to the First Amendment analysis in the majority opinion.

[2] Section 2, First reads:  "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof."  45 U.S.C. § 152, First.

authority to issue injunctions related to labor disputes in most instances.

## I.   History

### A.  History of the NLGA

As the Supreme Court has observed, "[t]he Railway Labor Act cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve." *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 444 (1987) (internal quotations omitted). Towards the end of the nineteenth century and the beginning of the twentieth, the federal judiciary issued a large number of labor injunctions. Pejoratively called "government by injunction," judicial interference in labor relations became an issue of national importance by the end of the nineteenth century. *See* 1 The Developing Labor Law 7 (John E. Higgins, Jr. & Patrick Hardin eds., 4th ed. 2002). Nearly every congress between 1894 and 1914 considered proposals to restrict the judiciary's injunctive power. *See* Felix Frankfurter and Nathan Greene, The Labor Injunction 163 (New York, 1930).

Congress first attempted to strip federal courts of jurisdiction to issue labor injunctions when it passed the Clayton Act in 1914.[3]   The Supreme Court, however,

---

[3] The Clayton Act states: "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment . . . ." 29 U.S.C. § 52. The Supreme Court noted over 70 years later that "[t]he language of the

narrowly construed the Clayton Act in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443 (1921), and "[d]uring the 1920's, courts issued over 2,100 anti-strike decrees . . . ." Forbath, Law and the Shaping of the American Labor Movement 1227 (1991). Congress, however, remained "intent upon taking the federal courts out of the labor injunction business," *Marine Cooks*, 362 U.S. at 369, and it passed the NLGA, which broadly stripped federal courts of jurisdiction to issue injunctions in labor disputes, in 1934.[4] "[I]n passing the Norris-LaGuardia Act, Congress described federal labor injunctions unequivocally as abuses of judicial power." *Burlington N. Santa Fe Ry. Co.*, 203 F.3d 703, 709 (9th Cir. 2000) (en banc) (internal quotations omitted). As the Supreme Court later described it, the NLGA was an "extraordinary step . . . necessary to remedy an extraordinary problem." *Burlington N. R.R. Co.*, 481 U.S. at 437.[5]

---

Clayton Act was broad enough to encompass all peaceful strike activity." *Burlington N. R.R. Co.*, 481 U.S. at 438.

[4] "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter." 29 U.S.C. § 101.

[5] I, of course, do not suggest that my colleagues in the majority bear any resemblance to the judges criticized in connection with the passage of the NLGA. Even though I disagree with their analysis, I acknowledge that my colleagues hold their views in good faith, and that they are construing the law as they understand it.

**B. History of the RLA**

Congress did not intend to leave a regulatory vacuum in place of judicial intervention in labor relations. Rather, it sought to replace ad hoc "government by injunction" with a means by which carriers and organized labor could amicably settle their disputes without government intervention, and without disrupting rail service and the national economy. After a number of legislative false starts, representatives of both the railway carriers and labor unions met to draft a bill that would be mutually satisfactory.[6]  The product of their cooperation was the RLA. *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 758 (1961) ("It is accurate to say that the railroads and the railroad unions between them wrote the Railway Labor Act of 1926 and Congress formally enacted their agreement.").[7]

This history reveals two principles that cut against the majority's construction of the RLA. First, courts should be wary of involving themselves in labor disputes in light of Congress's goal of "taking the federal courts out of the labor injunction business." *Marine Cooks*, 362 U.S. at 369.

---

[6] Unions had gained increased prominence while the railroads were under federal control due to World War I. *See* Chris Hollinger, The Railway Labor Act, ABA Section of Labor and Employment, 49 (2012). Due in part to unions' increased prominence, by the time the federal government returned the railways to private control in 1920 "about 90% of the train and engine service employees were organized and about three-quarters of those in the other classes." Lloyd K. Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L.J. 567, 570 (1937).

[7] The RLA was extended to cover the airline industry in 1936. RLA § 201; 45 U.S.C. § 181.

Second, the RLA represents a compromise between labor and management, in which each group sacrificed some avenues of self help in exchange for certain protections. The majority's opinion violates both principles.

## II. Discussion

A district court "has jurisdiction and power to issue necessary injunctive orders (to enforce compliance with the requirements of the Railway Labor Act) notwithstanding the provisions of the Norris-LaGuardia Act." *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 42 (1957) (citing *Bhd. of R.R. Trainmen v. Howard*, 343 U.S. 768, 774 (1952)). However, "while federal courts may issue injunctions in labor disputes to compel the parties to fulfill their obligations under the RLA, when no such duties exist, the Norris-LaGuardia Act controls." *Fed. Express Corp. v. Teamster Union, Local No. 85, of Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am., S.F., Cal.*, 617 F.2d 524, 526 (9th Cir. 1980) (citations omitted). In determining whether such duties exist, "[t]he specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act." *Chi. R. & I. R. Co.*, 353 U.S. at 42. A review of the cases applying these principles shows that labor injunctions in industries covered by the RLA have been found to be appropriate in two contexts: first, where parties fail to adhere to a specific duty in the RLA, including a duty to participate in the RLA's dispute resolution procedures;[8] and second, where parties

---

[8] *See*, *e.g.*, *Burlington N. R.R. Co.* 481 U.S. at 444 (declining to uphold a strike injunction because "[t]he RLA's silence could just as easily signify an intent to allow the parties to resort to whatever self-help is legally available at the time a dispute arises"); *Va. Ry. Co. v. Sys. Fed'n*

attempt to achieve ends provided for in the RLA without following the corresponding RLA procedures.[9]

Thus, the Fuellers "do not need to find a particular provision in the RLA to justify [striking]. [Instead] [t]he affected [carrier] must find a specific mandate of the RLA that prohibits the [strike]." *Ry. Labor Execs. Ass'n v. Wheeling & Lake Erie Ry. Co.*, 914 F.2d 53, 56 (4th Cir. 1990). Further, the RLA mandate underlying the injunction must be both clear and unambiguous. *Burlington N. R.R. Co.*, 481 U.S. at 446. ("Faced with a choice between the ambiguity in the RLA and the unambiguous mandate of the Norris-LaGuardia Act, we choose the latter."); *see also*, *e.g.*, *Pan Am. World Airways, Inc. v. Int'l. Bhd. of Teamsters*, 894 F.2d 36, (2d Cir. 1990) (finding that the RLA did not impose a specific mandate on employees to refrain from intermittent work stoppages). In light of the above, the key question in this case is whether the RLA imposes a clear and

*No. 40*, 300 U.S. 515, 549 (1937) (holding that an employer could be enjoined for failing to "treat" with an elected representative as required by Section 2, Ninth of the RLA); *Burlington N. Santa Fe Ry. Co.* 203 F.3d at 713 (holding that courts can issue strike injunctions where "the [RLA] provides the procedure for resolving the dispute").

[9] *See*, *e.g.*, *Bhd. Of Locomotive Eng'rs v. Louisville & Nashville R.R. Co.*, 373 U.S. 33, 41–42 (1963) (holding that permitting strikes aimed at enforcing arbitration awards stemming from minor disputes would render "meaningless" the RLA provisions that call for judicial enforcement of such awards); *Chi. R. & I. R. Co.*, 353 U.S. at 34 (holding that employees could not strike to protest minor disputes, because allowing employees to do so would render the RLA's procedures for addressing minor disputes, which call for arbitration, meaningless); *Summit Airlines, Inc. v. Teamsters Local Number 295*, 628 F.2d 787 (2d Cir. 1980) (holding that allowing employees to force recognition of a union by striking would undermine provisions of the RLA concerning representation disputes).

unambiguous duty on the Fuellers to refrain from striking.  I conclude that it does not.

### A.  Section 152, First Does Not Impose a Duty on the Fuellers to Refrain from Striking

The majority purports to find a clear and unambiguous duty in Section 2, First.  No other court has ever found such a freestanding duty in that Section.  Instead, every court that has upheld a labor injunction under the auspices of the RLA has looked to the specific procedures and duties created by other sections of the RLA.  Furthermore, the majority's decision conflicts with the Supreme Court's analysis of Section 2, First, which clarifies that Section 2 does not impose duties to engage in or refrain from acts not elaborated in other sections of the RLA.

As the majority concedes, the non-unionized Fuellers are not clearly subject to the dispute resolution procedures of the RLA.  Maj. at 17–18 (requiring the Fuellers to unionize in order to pursue dispute resolution under the RLA).  Nor are they seeking to achieve ends envisioned in the RLA, such as selecting a bargaining representative or negotiating a collective bargaining agreement (CBA). Unable to locate a specific duty in the body of the RLA, the majority is thus compelled to base its holding on the broad aspirational language of Section 2, First.  This holding creates a third justification for labor injunctions under the RLA that is both unprecedented and contrary to the Supreme Court's understanding of Section 152, First.

In *Virginian Railway*, the Supreme Court observed that "the very words of [s]ection 2, First . . . were taken from section 301 of the Transportation Act . . . , [and] were held to

be without legal sanction in that act." *Va. Ry. Co.*, 300 U.S. at 544–45 (citing *Pa. R.R. Sys. & Allied Lines Fed'n v. Pa. R.R. Co.*, 267 U.S. 203, 215 (1925)).  While holding that the RLA imposed obligations on unions and employers, the Court noted that "these words no longer stand alone and unaided by mandatory provisions of the statute as they did when first enacted," because Section 2, Ninth of the RLA created mandatory obligations on employers to treat with unions.  *Id.* Continuing this theme, the Supreme Court held in 1943 that Section 2, First "merely states the policy which those other provisions [of the RLA] buttress with more particularized commands."  *Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs. for Mo.-Kan.-Tex. R.R. v. Mo.-Kan.-Tex. R.R. Co.*, 320 U.S. 323, 334 (1943) (*M-K-T*).  In other words, the Court held that Section 2, First is not a freestanding obligation, but rather a command that parties to a labor dispute undertake the specific grievance procedures detailed in the other portions of Section 2, and in the rest of the RLA.

The majority wholly relies on the Court's subsequent holding that Section 2, First is "more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chi. & N. W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577 (1971).  But the independent legal obligation the Court described in *Chicago and North Western* was not a new requirement, but rather a gloss on the duty, already recognized in *M-K-T*, to utilize the RLA's procedures where applicable.  Indeed, the Court explained that Section 2, First's duty to "exert every reasonable effort" was essentially a requirement not to bargain in bad faith or to "go[] through the motions with a desire not to reach an agreement."  *Chicago*

*& N. W. Ry. Co.*, 402 U.S. at 578, 579 n.11.[10]  The Court thus held that the duty in Section 2, First does not create new obligations, but instead allows courts to inquire into how diligently the respective parties have tried to satisfy their obligations under the other provisions of the Act.  *See Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co.*, 358 F.3d 453, 457–58 (7th Cir. 2004)  ("The Supreme Court has considered Section 2, First analogous to the 'duty under the National Labor Relations Act to bargain in good faith.'" (quoting *Chi. & N.W. Ry. Co.*, 402 U.S. at 574–75)).  *Chicago & North Western* thus instructs courts to enforce the duty to bargain in good faith, as appropriate.  It does not give courts license to invent new duties under that Section, as the majority does here.

The majority also ignores the fact that the Court in *Chicago & North Western* instructed lower courts not to use that decision to enlarge the scope of Section 2, First.  The Court explicitly cautioned that "great circumspection should be used in going beyond cases involving [a] desire not to reach an agreement, for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements."  *Chi. & N. W. Ry. Co.*, 402 U.S. at 579 n.11 (internal quotations omitted).  The Court was also concerned that "the vagueness of the obligation under [Section] 2 First could provide a cover for judicial interference in labor

---

[10] The dissent framed the question presented in *Chicago and North Western* as; "to what extent a District Court may inquire into collective negotiations in determining whether a party has complied with its statutory duty."  *Chicago & N. W. Ry. Co.*, 402 U.S. at 588 (Brennan, J., dissenting).

relations of the sort that spawned the Norris-LaGuardia Act in the first place." *Id.* at 583.

Because the majority cannot find a specific duty in the dispute resolution procedures of the RLA upon which to rest its case, it improperly relies on the preambular language in Section 2, First to create an unprecedented, nebulous new obligation requiring the Fuellers alone to take affirmative action to bring its disputes with the ASIG within the ambit of the RLA.

The majority cites a number of cases for the proposition that "section 2 First imposes an independent, mandatory duty enforceable by the courts." Maj. at 13–14. I do not dispute that Section 2, First creates a mandatory duty. This case instead concerns the scope of that duty. Indeed, the cases cited by the majority support reading Section 2, First as imposing a duty to bargain in good faith under the RLA *when it applies* rather than imposing a duty to unionize on unrepresented workers. *See Reg'l Airline Pilots Ass'n v. Wings W. Airlines, Inc.*, 915 F.2d 1399, 1401 (9th Cir. 1990) ("RAPA contends that the change in pass benefits after September 19 [when RAPA was certified as a bargaining representative] was a violation of section 2, First and Second because Wings West did not use the bargaining process and, in fact, distorted the bargaining process by a pre-bargaining reduction in benefits."); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1309 (11th Cir. 2001) (finding that Section 2, First imposed a duty on a union to prevent its members from "collectively disrupt[ing] Delta's flight operations, in contravention of the CBA . . . , by way of a no-overtime campaign"); *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Trans World Airlines, Inc.*, 839 F.2d 809, 812–14 (D.C. Cir. 1988) (holding that Section

2, First imposed a duty on management not to unilaterally change working conditions pending negotiation of a CBA with a newly certified union).

## B.  The Majority Opinion Fundamentally Disturbs the Balance of Interests Contemplated by the RLA

Section 2, First states that all carriers and employees have a duty to "exert every reasonable effort to make and maintain agreements . . . and to settle all disputes whether arising out of the application of such agreements or otherwise . . . ." 45 U.S.C. § 152, First.   The majority concludes that this means that the Fuellers have an obligation to unionize and bargain collectively.  This reading of Section 2, First clashes with the plain language of the RLA, which gives employees the "right to organize and bargain collectively through representatives of their own choosing."  45 U.S.C. § 152, Fourth.  Whereas the RLA simply grants employees a *right* to organize, the majority imposes an *obligation* on the employees to seek unwanted representation.

Furthermore, the majority's distorted reading of Section 2, First undermines the compromise between labor and management inherent in the RLA itself.  The majority holds that the Fuellers may strike only after they have appointed a representative and attempted to negotiate a CBA. Maj. at 17–18.   The National Mediation Board (NMB), however, concluded that the Fuellers were not a "class or craft" capable of appointing a representative.  *See* NMB Letter at ECF No. 14.1 (declining to mediate the dispute between the Fuellers and ASIG).  The majority thus imposes an impossible burden on the Fuellers:  The Fuellers must organize before they can engage in self help, but the Fuellers

cannot organize.[11]  This result cannot be squared with the deal struck by the drafters of the RLA, in which employees forfeited their right to strike at will in return for the promise that employers would negotiate with their designated representatives in good faith.

Here, the Fuellers have made strenuous efforts to resolve their differences with ASIG concerning the safety of their working conditions, and the allegedly retaliatory suspension of Mr. Popescu, including: asking ASIG to explain its investigation into and suspension of Mr. Popescu; reaching out to ASIG's Human Resource Department; and asking the NMB to mediate their dispute.  In contrast, ASIG has steadfastly refused to even speak with the Fuellers, either individually, or as a group.  By foreclosing the ability of the Fuellers to negotiate, the majority's decision leaves them with only two options: they must either acquiesce to what they view as unsafe working conditions and vindictive management behavior, or they must quit.

In essence, the majority opinion relies on the following syllogism:

---

[11] The NMB has determined that ASIG Fleet Services Employees, which includes the Fuellers, constitute a nationwide system.  *See* 40 NMB No. 13 at 49.  Accordingly, the Fuellers can only unionize by obtaining the votes of 50% of ASIG's national employees.  *Id.* at 48–49.  The majority is thus incorrect that the Fuellers, who constitute only the service employees at Sea-Tac, can organize to protect their interests.  Even if every member of the Fuellers seeks a representative they would not be entitled to recognition without a national election.  *Id.*  The majority's decision thus imposes burdens under the RLA on a group of workers, the Fuellers, who lack any recourse to the protections of the RLA, which are predicated on the existence of a certified representative.

- Major Premise:  Section 2, First requires that employees attempt to settle disputes through RLA procedures.

- Minor Premise: Although the Fuellers are not presently subject to those procedures because they seek neither a representative nor a CBA, the employees **could** take advantage of the RLA by appointing a representative and seeking a CBA.

- Conclusion: Because the Fuellers could take advantage of the RLA by taking certain voluntary predicate acts, namely unionizing, Section 2, First imposes a duty on the Fuellers to take those predicate acts so that they can avail themselves of the RLA.

Requiring parties to take affirmative actions in order to bring themselves within the RLA's dispute resolution procedures will, among other things, dramatically alter the manner in which unions in industries covered by the RLA gain recognition, as is evident in this very case.[12]  Because both employers and employees are bound by the same language in Section 2, First, the majority's logic must apply equally to both.  45 U.S.C. § 152, First.  ASIG refuses to negotiate with the Fuellers because they are not a duly certified union.  However, while employers are not obligated to negotiate with representatives that are not certified by the NMB, they may choose to do so.  *See Summit*, 628 F.2d at

---

[12] Presently, employers are only obligated to negotiate with representative that have been elected by 50% of the "craft or class" attempting to unionize pursuant to the RLA.  *See* 45 U.S.C. §§ 152, Third, Fourth, Ninth.  The NMB has determined that ASIG Fleet Services Employees, which includes the Fuellers, constitute a nationwide system.  *See* 40 NMB No. 13 at 49.

795. Thus employers, just like employees, can opt to bring disputes within the ambit of the RLA through voluntary predicate actions, namely by recognizing a representative that has not been certified by the NMB. The logic of the majority opinion then would, apparently, not only require that the Fuellers attempt to appoint a representative, it would also require ASIG to voluntarily recognize any resulting representative in order to begin negotiating a CBA. Obviously, such a rule would dramatically alter the NMB's role in certifying union elections. *See* 45 U.S.C. § 152, Ninth.

## III.    The Injunction Must Be Vacated Because ASIG has not Complied with Section 8 of the NLGA.

Even if the majority's one-sided construction of the RLA could be justified, the injunction must still be vacated because ASIG failed to comply with the requirements of Section 8 of the NLGA before seeking that injunction. In order to obtain a labor injunction, a complainant must not only seek to enjoin behavior that falls within an exception to the NLGA, it must meet the statutory requirements set out in that Act. 29 U.S.C. § 101 ("No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter . . . ."). Section 8 of the NLGA states that "[n]o restraining order or injunctive relief shall be granted to any complainant who has failed . . . to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U.S.C. § 108. This principle applies even where the injunction is aimed at enforcing compliance with a specific duty of the

RLA. *See Grand Trunk W. R.R., Inc. v. Bhd. of Maint. of Way*, 497 F.3d 568, 571 (6th Cir. 2007) (analyzing whether employer had complied with Section 8 where the injunction sought to enforce provisions of the RLA). In order to comply with Section 8, a complainant "must also go beyond [its legal obligations] and make all reasonable effort, at the least by the methods specified if they are available, though none may involve complying with any legal duty." *Bhd. Of R.R. Trainmen Enter. Lodge, No. 27 v. Toledo P. & W. R.R.*, 321 U.S. 50, 57 (1944).

The majority holds that because the Fuellers "have not carried their duty under the RLA, ASIG has shirked none of its duties." Maj. at 23. In other words, the majority contends that because the Fuellers have not sought a representative, ASIG does not have a legal obligation to negotiate. *Id.* Section 8, however, requires ASIG to take steps to resolve a dispute even if it is not legally required to do so, prior to even seeking an injunction. *See Bhd. Of R.R. Trainmen Enter. Lodge, No. 27*, 321 U.S. at 57; *Carter v. Herrin Motor Freight Lines*, 131 F.2d 557, 561 (5th Cir. 1942) ("[The NLGA] denies the equitable relief of injunction to one, who, as plaintiff did here, standing upon his legal rights, fails to use every reasonable effort by negotiation, mediation or arbitration to find a common ground for composing and settling a labor dispute."). Interestingly, this language mirrors the language that the majority finds so persuasive in Section 2, First of the RLA. 45 U.S.C. § 152, First. Surely if "every reasonable effort" requires the Fuellers to seek a representative before they can strike, the same language in the NLGA requires ASIG to at least make some effort to resolve the dispute before seeking the drastic remedy of a labor injunction. Accordingly, ASIG has not fulfilled its obligations under Section 8 of the NLGA, the district court

did not have jurisdiction to issue the injunction in this case, and the injunction issued by the district court should be vacated.

## Conclusion

The majority reads the ambiguous language of Section 2, First too broadly, while at the same time inappropriately reading the language of NLGA Section 8 out of existence. Because the Fuellers have violated no express provision of the RLA, and ASIG failed to satisfy the condition precedent in Section 8 of the NLGA before seeking an injunction, the district court had no jurisdiction to issue that injunction, and it should be vacated.

I respectfully dissent.